**CITY OF EUFAULA, ALABAMA,**
Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 19534.

United States Court of Appeals
Fifth Circuit.

Jan. 17, 1963.

Alto V. Lee, III, Dothan, Ala., Archie I. Grubb, Eufaula, Ala., for appellant.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, S. Billingsley Hill, George S. Swarth, A. Donald Milour, Attys., Dept. of Justice, Washington, D. C., Hartwell Davis, U. S. Atty., Montgomery, Ala., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

The question presented on appeal here is whether there was such a "taking" by the United States of the sewerage system of the City of Eufaula, Alabama as to make it liable for the costs of a treatment plant when the States of Alabama and Georgia ordered the City to cease dumping raw sewage into the Chattahoochee River upon the impounding of its waters adjacent to the City by the government. The United States is constructing a lock and dam in the river, and when the dam is completed the City will no longer be allowed by the health authorities of the two States to discharge raw sewage into the river as it had been doing for many years. The court below held that the United States was not liable in an eminent domain proceeding for the damages arising from their refusal. We agree.

The facts are substantially stipulated. For many years Eufaula has discharged its sewage into the river through a pipe and ditch system, the sewage flowing into the river at an elevation of 133.3 feet above mean sea level. The system is operated entirely by gravity. When the dam is completed the portion of the sewer pipe (and the strip of land containing it) below 198.3 feet above m. s. l. will be inundated by the backed-up stream. The United States determined that the value of the City property physically taken was $14,050.00, and this amount was paid into court and no appeal is taken from that order.

When the dam is completed and the waters pooled, however, the health authorities of Alabama and Georgia will no longer allow the City of Eufaula to discharge raw sewage into the river, although the sewerage system would, with slight modification, then perform as well as before. Once the river is dammed, the health authorities of the two States will require primary and secondary treatment of the sewage prior to discharge into the dammed-up river. The cost of such treatment plants is what the City here demands of the United States as recoverable damages, although it actually amounts to payment for an additional facility. The United States has not registered any objection to the continued raw sewage discharge.

The United States, as a compromise, offered to provide a forced main system which would pump the sewage to the bottom of the river. This facility, costing over one hundred thousand dollars, was refused by Eufaula, as it would not be satisfactory to the State authorities who insist on a primary and secondary treatment system, which will cost something over a million dollars.

Eufaula contends that, in effect, the building of the dam by the United States is to "take" its present sewerage system and this "taking" must be compensated under the Fifth Amendment to the Constitution. The City relies upon the asserted general principle that the measure of damages to a municipality is the cost of an adequate substitute facility. Although it is the State authorities alone forbidding the emptying of raw sewage —so the argument goes—such denial of the use of the river is a result of the government's building of the dam.

The government contends that it is not the United States but the State health authorities who are "taking" Eufaula's right, if it has one, to empty sewage into the river. It contends, moreover, that, even if it be conceded that the United States is "taking" Eufaula's rights, this taking is not compensable under the Fifth Amendment, inasmuch as no one has a right superior to that of the United States in the waters of a navigable stream; from which it follows that "rights" lost as a result of a navigation improvement process are not compensable.

At the outset, we distinguish between the 1.32 acre easement and pipe actually taken by the raising of the water level on the one hand, and the alleged taking of the residue of the sewerage system resulting from the damming of the stream and the consequent unsatisfactory nature of the present system on the other. It is not disputed that the system will physically operate as well after the taking as before. Further, maintenance of the portion condemned would be dispensed with, and the system remaining would, to that extent, operate more economically. The easement actually taken has been paid for and has no relevance in the argument with respect to the residue of the system.

We need not decide the question whether the United States could forbid the City of Eufaula to discharge raw sewage into the river, that question not being before us. The question here is whether the United States' actions, admittedly in furtherance of navigation and commerce, which merely furnish the occasion for the withdrawal by the States of the City's right to discharge sewage into the navigable stream, creates in the City of Eufaula a claim against the United States under the Fifth Amendment.

■■ No one can own a property interest in a navigable river superior to the dominant power of the United States to control and regulate that stream in the interest of interstate commerce. United States v. Twin City Power Co., 1956, 350 U.S. 222, 76 S.Ct. 259, 100 L. Ed. 240. Whether the City has a property right under state law to use the flow of the river for sewage disposal is immaterial, for any such right is "subject to the power of Congress to control the waters for the purpose of commerce." United States v. Appalachian Electric Power Co., 1940, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243.

748

The principles so well enunciated by Mr. Justice Jackson, speaking for the Court in United States v. Willow River Power Co., 1945, 324 U.S. 499 et seq., 65 S.Ct. 761, 89 L.Ed. 1101, are controlling here. The Power Company had been awarded $25,000 by the Court of Claims as just compensation for impaired efficiency of its hydroelectric plant caused by the action of the United States in raising the water level of the St. Croix River. The Supreme Court reversed, holding that the Power Company's interest or advantage in the high water level of the river was not a right protected by law and that the destruction of that interest did not amount to a "taking" of private property for which compensation is required by the Fifth Amendment. These principles are clearly stated in the following quotation from the opinion:

"The Fifth Amendment, which requires just compensation where private property is taken for public use, undertakes to redistribute certain economic losses inflicted by public improvements so that they will fall upon the public rather than wholly upon those who happen to lie in the path of the project. It does not undertake, however, to socialize all losses, but those only which result from a taking of property. If damages from any other cause are to be absorbed by the public, they must be assumed by act of Congress and may not be awarded by the courts merely by implication from the constitutional provision. The court below thought that decrease of head under the circumstances was a 'taking' of such a 'property right,' and that is the contention of the claimant here.

"It is clear, of course, that a head of water has value and that the Company has an economic interest in keeping the St. Croix at the lower level. But not all economic interests are property rights; only those economic advantages are 'rights' which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion. The law long has recognized that the right of ownership in land may carry with it a legal right to enjoy some benefit from adjacent waters. But that a closed catalog of abstract and absolute 'property rights' in water hovers over a given piece of shore land, good against the world, is not in this day a permissible assumption. We cannot start the process of decision by calling such a claim as we have here a 'property right'; whether it is a property right is really the question to be answered. Such economic uses are rights only when they are legally protected interests. * * * [pp. 502–503, 65 S.Ct. p. 764.]

"Operations of the Government in aid of navigation ofttimes inflict serious damage or inconvenience or interfere with advantages formerly enjoyed by riparian owners, but damage alone gives courts no power to require compensation where there is not an actual taking of property. * * * Such losses may be compensated by legislative authority, not by force of the Constitution alone." [p. 510, 65 S.Ct. p. 767.] [1]

The only actual "taking" by the United States here from Eufaula's sewerage system was the 1450 feet of pipe leading to its outfall, from which it resulted that the sewage would be dumped into the river at 198.3 feet m. s. l., instead of 133.3 feet m. s. l. No damages are claimed to have followed that taking

[1]. And see also United States v. Chandler-Dunbar Co., 229 U.S. 53, 69, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); United States v. River Rouge Co., 269 U.S. 411, 419, 46 S.Ct. 144, 70 L.Ed. 339 (1926); United States v. Appalachian Electric Power Co., 311 U.S. 377, 423, 61 S.Ct. 291, 85 L. Ed. 243 (1940); United States v. Commodore Park, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945); and United States v. Grand River Dam Authority, 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960).

which have not already been provided for in the portion of the court's order from which no appeal was taken. The only substitute facility actually necessitated by the raising of the water level, therefore, was the simple mechanical change involved in adapting the existing outlet pipes to the new water level.

The other item of damage claimed by the City is the cost of the treatment plants which the two States took occasion to require at the time the construction of the dam was in progress. Eufaula had never had a treatment plant, and such a plant would not be included in the substitute facility which the Government was under obligation to supply. Such is the teaching of the Supreme Court cases supra.

The installation of one or more treatment plants as a *sine qua non* of the continued dumping of sewage into the river resulted not from any action or requirement of the United States, but from the exactions of the two States. It might be said that the raising of the water level precipitated or furnished the occasion for the inclusion of this new and different requirement by the two States, but it cannot be said that the United States, in any legal sense, caused it.

For this reason, as well as the undisputed fact that what the United States did was in furtherance of its paramount right and duty with respect to navigable waters, we think that the cost of the treatment plants cannot be recovered from the United States in this case.

Appellant relies heavily for support of its contrary position upon the case of Town of Clarksville, Virginia v. United States, 4 Cir., 1952, 198 F.2d 238, certiorari denied, 344 U.S. 927, 73 S.Ct. 495, 97 L.Ed. 714. There, the raising of the level of the Roanoke River some distance below Clarksville inundated forty-one percent of the town's area and rendered useless its sewerage system, which was a gravity system similar to the one used by the City of Eufaula.

The parties stipulated that just compensation should be paid for a substitute system, and the question before the court was what type of system the United States could be required to provide. There, the State Water Control Board of Virginia forbade Clarksville to empty raw sewage into the river after the then existing system was taken. The town had a permit of indefinite duration to run raw sewage into the Roanoke, but the policy of the Board was that the permit should be revoked if the system was substantially changed. The Board, therefore, issued an order prohibiting the use of the proposed new system (a raw discharge system with lift pumps, offered by the United States as a substitute) unless a treatment plant should be added. It was decided in that case that the United States must stand the cost of the treatment plant as a part of the substitute facility.

There are important differences in the facts between that case and this one. Clarksville's sewerage system was destroyed for all practical purposes. It could no longer operate a gravity system, but had to lift its sewage by the installation of an elaborate network of lifting devices. No substitute facility would be adequate which did not provide means to dispose of the sewage which were as adequate as those existing before the change in water levels. The court below refused to follow that case in the decision of this one because "the Town of Clarksville was not, pecuniarily speaking, [merely] restored to its former condition, but at the federal taxpayers' expense obtained a windfall in the construction of treatment facilities, which it did not previously have but which it was required to construct to keep from polluting a navigable stream."

It may be that the facts of that case warranted the application of the equitable principles which the Court of the Fourth Circuit applied in approving treatment plants as a part of the substitute facilities to which Clarksville was entitled. But we have no difficulty in concluding that such is not the case here. We think that under the Twin City Power case and the other Supreme Court

750

cases mentioned supra, the District Court correctly rejected the City's claim here that the United States was under obligation to pay the costs of sewage treatment plants. The judgment appealed from is, therefore,

Affirmed.