UNITED STATES of America,
Plaintiff,

v.

531.13 ACRES OF LAND, MORE OR LESS, Situated IN OCONEE COUNTY, STATE OF SOUTH CAROLINA, and J. P. Stevens and Company, Inc., et al., Defendants.

Civ. A. No. 2788.

United States District Court
W. D. South Carolina,
Anderson Division.

Aug. 28, 1965.

John C. Williams, U. S. Atty., and Robert O. DuPre, Asst. U. S. Atty., Greenville, S. C., for the Government.

Watkins, Vandiver, Kirven & Long, Anderson, S. C., and David L. Freeman (of Wyche, Burgess, Freeman & Parham), Greenville, S. C. (David L. Freeman, Vandiver, Kirven & Long, Anderson, S. C., was with the firm of Watkins, at the time the action was begun) for defendants.

SIMONS, District Judge.

The issues before the court in the instant case concern objections by the United States to the Report of a Land Commission appointed in condemnation proceeding for the Federal Hartwell Dam Project on the Savannah River. The Order by Honorable C. C. Wyche, Judge of the Western District of South Carolina, dated December 4, 1964, appointing the Commission pursuant to Rule 71A of the Federal Rules of Civil Procedure provided in part that the Commission would:

> " * * * take testimony * * * regarding just compensation and any question of title which may arise in each of the tracts, and render a full report to this court with regard to said questions and such other questions as may arise, together with their recommendations concerning their conclusions of law and fact." [1]

No exceptions to this Order were taken by the Government or the landowners.

The condemnation was commenced by the filing of the complaint together with the declaration of taking on August 9, 1960. The property of the landowner, J. P. Stevens and Company, Inc., the subject of this action, was located on Martin's Creek and the Seneca River in Oconee County, South Carolina. Landowner's entire tract contained 905.64 acres, more or less, before the taking, and was the site of a textile plant known as the Utica-Mohawk Mill. There were 509.64 acres taken by the Government in fee and 21.49 acres subjected to easements. The textile plant, consisting of grey mill, finishing and fabricating operations, is located on the remaining property which was not taken by the Government.

Landowner contends there are three elements of damages caused by the taking: 1] Value of land and easements taken; 2] compensation for a raw water intake station; and 3] just compensa-

---

1. The Commission was appointed by Judge Wyche to hear this as well as several other cases.

tion for the taking of its property and flowage rights in Martin's Creek and Seneca River, non-navigable streams, which necessitated the construction and operation of a waste disposal system. Government has made no exceptions to the Commission's award, except as to that portion providing that landowner is entitled to compensation for such property and flowage rights taken with evaluation thereof based upon the costs of construction and maintenance of a waste disposal system. The uncontested portion of the award has been paid; and that portion of the award relating to the waste disposal system has been preserved by stipulation of the parties. The Commission awarded the landowner compensation for the taking of such rights from the landowner based upon the costs of $430,398.16 for the construction of the waste disposal system, which consisted primarily of a treatment plant, and $118,942.86 for the maintenance of the system, for a total of $549,341.02.

Prior to the taking of the landowner's property, the industrial wastes from landowner's textile plant had been carried away through open ditches into Martin's Creek, thence into the Seneca River, where it was washed and cleansed by the flow of the Seneca. The distance from the discharge pipes at the mill to the Seneca River was slightly more than 6000 ft., half of such distance being in Martin's Creek, the remainder being in open ditches on lands taken by the Government. Prior to the taking, landowner's property ran to the center of Martin's Creek, and an easement was held by the landowner from the owner of the property on the opposite side of Martin's Creek permitting the discharge of its industrial wastes from the textile plant.

The facts as found by the Commission reveal that the industrial wastes placed in Martin's Creek by the landowner caused a high PH [acid-alkaline] factor and that the oxygen [BOD] was affected. It further found that these factors were present in the waters of Martin's Creek as they entered the Seneca River. How-

ever, the Commission further found that the wastes "did not affect the primary focus of pollution control: protection of human beings;" and that effect of the presence of a high alkaline PH range was to reduce the caliform bacteria count which affects humans and animals. Furthermore, the Commission found "that at the first testing point below Martin's Creek in Seneca River this factor [PH] had dropped within allowable tolerances for all stream classifications."

The textile plant was acquired by the landowner in 1952. There is no evidence in the record that the discharge of the industrial waste materials into the Seneca River and Martin's Creek had ever been injurious to lower riparian owners or animals, or that they had ever created a nuisance by being discharged into these waters. According to testimony of Mr. Linton, Director of the S. C. Water Pollution Control Authority, there was no plan or proposal by the State to reclassify the Seneca River from its "C" Classification prior to the Government project. There is a strong probability that Stevens could have operated its disposal facilities in the same manner for many years, if not indefinitely, if there had been no impoundment of the Hartwell Lake by the Government.

The waters impounded by Hartwell Dam on the Savannah River flooded the Seneca River and backed up into part of Martin's Creek covering the land at the point where the open ditch emptied landowner's industrial wastes into Martin's Creek. After the impoundment of these waters, the South Carolina Water Pollution Control Authority reclassified Seneca River from a class "C" to a class "A" stream, making it mandatory that the landowner construct a waste disposal system to comply with the requirements of the State. The Corps of Army Engineers recommended that Stevens continue to discharge its industrial wastes directly into the reservoir created by the construction of Hartwell Dam. The State rejected this and various other suggestions by the Government as to construction of the waste disposal facility.

The Government in its objections to the report of the Commission contends principally that: [1] The Seneca River is a navigable stream of the United States; that the Government's paramount navigation servitude precludes any recovery; and that landowner owned no property right in the flow of Martin's Creek or the Seneca River; United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 [1956]; [2] Even if the Seneca River is determined to be non-navigable, the landowner is not entitled to be compensated for its waste disposal facility, because there was no taking of its waste disposal system or any of its property rights by the Government necessitating the construction of this facility. City of Eufaula, Ala., v. United States, 313 F.2d 745 [5th Cir. 1963]; and [3] The Government would not be liable in any event for that portion of the award relating to operation and maintenance costs of the waste disposal system. In addition to these contentions, the Government also argues that Stevens had no property right to pollute a non-navigable stream which is a tributary of a navigable stream; that it was strictly State, not Federal, action which required Stevens to build a substitute waste disposal system, as a result of the State's reclassification of the stream; and that such damages, if any, are consequential and not compensable.

The landowner acquired subject property and plant in 1952 and, until impoundment of the waters by the Hartwell Dam Project, had disposed of its industrial wastes across its lands in ditches which dumped the same into Martin's Creek, and thence into Seneca River where the waste was flushed, cleansed and flowed away.

The Government contends that Stevens had no "rights" to discharge waste materials in the Seneca River; and, therefore, that it lost no "flowage" rights caused by the impoundment of waters behind the Hartwell Dam. This court cannot agree.

South Carolina recognizes that each riparian owner has a "right" to have waters from adjacent streams flow away from his property unobstructed. As stated in Omelvany v. Jaggers, 2 Hill, S.C., 634, [1835]:

> "The general principal applicable to all such cases is, that the proprietors of the soil through which a stream runs, have the right to its use and enjoyment, according to its natural flow, and *to appropriate it to any purpose not inconsistent with the rights of others above and below.*" [Emphasis added.]

The United States Supreme Court has also recognized this right in every riparian owner, and has held the United States responsible for the "taking" of such "flowage" rights from riparian owners on non-navigable tributaries of navigable streams, at locations where the rights of the Government are not paramount to those of the private landowners, United States v. Cress, 243 U.S. 316, at page 330, 37 S.Ct. 380, at page 386, 61 L.Ed. 746 [1917], wherein the Court stated:

> "Under the law of Kentucky, ownership of the bed of the creek, subject only to the natural flow of the water, is recognized as fully as ownership of the mill itself. The right to have the water flow away from the mill dam unobstructed, except as in the course of nature, is not a mere easement or appurtenance, but exists by the law of nature as an inseparable part of the land. A destruction of this right is a taking of a part of the land."

Landowner had the right to make reasonable use of the flow of waters of Martin's Creek and Seneca River. 93 C.J.S. Waters § 48. The reasonableness of the landowner's use of the waters of these streams prior to the Government's taking is a question of fact to be determined from all of the facts and circumstances as they existed at that time. The Commission has found Steven's use of the waters to be a reasonable use by a riparian industry, probably advantageous

to all lower riparian owners. South Carolina recognizes as a matter of law that manufacturers have a right to the reasonable use of streams and rivers for industrial purposes of disposing of their wastes, so long as such use works no material injury nor constitutes a nuisance to other riparian owners. White v. Whitney Manufacturing Co., 60 S.C. 254, 38 S.E. 456 [1901]. In making the factual determination of what constitutes a reasonable use, the trier of fact may consider the size of the stream, volume of water, necessity of use, and customs of the locale.

▮▮▮ I conclude that the Commission's finding that the landowner herein was making a reasonable use of the waters of the Seneca River and Martin's Creek is fully supported by the record in this case; and that Stevens had the right to have the flow of these streams leave its properties unobstructed. Cress, C.E.S. supra.

The main thrust of Government's contentions is that the Seneca was a navigable stream of the United States, and that the Government's *paramount servitude* would preclude Stevens' recovery based upon a taking of its flowage and property rights in such stream. Twin City Power Co., supra.

Therefore, the question of the navigability of the Seneca is of foremost importance in this case, as well as in the companion case involving the condemnation of the property of Duke Power Company located on the Seneca River at Portman Shoals,[2] a few miles downstream from the Stevens plant.

By stipulation the testimony relative to the issue of the navigability of the Seneca was taken for consideration in this case, and also in the condemnation proceeding of the property of Duke Power Company. The Commission's findings of fact and conclusions of law on the issue of navigability were the same in both condemnations; and objections to the Report in the condemnation of the

property of Duke Power Company were made by the Government and argued before me at the same time arguments were heard in this case.

At the hearing a full day was devoted to oral arguments. Briefs on all questions raised have been submitted by counsel for the parties; their briefs as to the question of navigability of the Seneca are addressed to both cases, since that issue is identical in each; and I have arrived at the same determination in each case insofar as said question of navigability is concerned.

The Government strongly contends that the question of navigability of the Seneca River is a question of law for the court to determine in the final analysis; or that it is a mixed question of fact and law, and that the "clearly erroneous" rule does not apply to the court's review of the Commission's findings and conclusions in this regard, citing United States v. Appalachian Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 [1940]; United States v. 91.69 acres in Oconee County, S. C., Excelsior Mills, Inc., 334 F.2d 229 [4th Cir. 1964]; United States v. Waymire, 202 F.2d 550 [10th Cir. 1955]; United States v. 5,677.94 acres in Montana, 162 F.Supp. 108 [D.C.Mont.1958]. In view of the position of the Government as to this vital question, I have reviewed the record fully, have considered all of the evidence presented by the parties to the Commission, and have made an independent determination of my own as to the navigability of the Seneca River. In reaching this judgment all of the Government's exceptions to the findings of the Commission have been considered; and as such exceptions are too numerous to recite, I shall comment only upon those I consider especially important in making my determination.

The Seneca is a stream approximately 27 miles long formed by the confluence of the Keowee River and Twelve Mile Creek. The Seneca and the Tugaloo Rivers flow together to create the Savan-

---

**2.** United States of America v. 531.10 acres in Anderson County, South Carolina, and

Duke Power Company and unknown owners, D.C., 243 F.Supp. 981.

nah River. At the confluence of these rivers was formerly the site of a town called Andersonville which has been abandoned for many years. Navigation was effected on the Savannah River up to that point. Portman Shoals, the location of Duke's dam and power house which were involved in the companion case [Civil Action No. 2814], is approximately eight miles upstream on the Seneca River from the old site of Andersonville. Stevens' property which is the subject of this action is located about eight miles upstream from Portman Shoals.

The Seneca-Keowee River was formed by the confluence of several smaller mountain streams originating in the Blue Ridge Mountains of North Carolina. These tributaries of the Savannah River are fairly swift streams in which are located many shoals. Witness Stribling, an engineer employed by Duke, testified that he made a survey of the shoals in the Keowee-Seneca River in 1942 finding 86 shoals in the 54 miles from the mouth of the Keowee to Andersonville at the head of the Savannah River. Portman Shoals, the most formidable of all the shoals, extended over a three mile area. The river fell 52 feet, or an average of 17.37 feet per mile, over this three mile stretch. This shoal area presented the most burdensome obstacle in navigating the river. Stribling testified that in making the survey in 1942 he found the depth of the river varied from less than one foot to two and one-half feet over most of the shoals; and that it was impossible to float his canoe on many of its stretches.

James W. Blair, a Government witness, made a survey of the Seneca River during 1929–1930 for the Corps of Engineers, as part of project to determine the potentialities for the full development and utilization of the entire Savannah River system. He testified that the Seneca was a "nice meandering" stream with well-defined banks and some bars in the river. He found the deep run or "thalweg" of the river to average about three feet. This depth varied with the width of the river.

These two witnesses, Stribling and Blair, presented the most graphic account of the physical characteristics of the river. There is no evidence in the record to indicate that the river underwent any marked changes in its physical characteristics over the years.

■■ The question of the navigability of a stream is a federal question which must be decided under federal law. United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 [1931]. United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 [1926]. Of paramount consideration is the susceptibility of the river or stream for use as a channel for useful interstate commerce in its natural state; and not necessarily the extent and manner of its actual use; and a river is navigable in law which is navigable in fact. Daniel Ball, 10 Wall [U.S.] 557, 19 L.Ed. 999; The Montello, 20 Wall. [U.S.] 430, 22 L.Ed. 391. In United States v. Appalachian Electric Power Company, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 [1940], the court stated that the test of navigability is not to be confined to the natural and unimproved condition of a river or stream; but that "it is proper to consider the feasibility of interstate use after reasonable improvements which might be made." The Court clarified this requirement, however, by further stating that "[t]here must be a balance between cost and need at a time when the improvement would be useful." 311 U.S. at page 407, 61 S.Ct. at page 299.

■ The burden of proof rests upon plaintiff to establish that the Seneca is navigable, or susceptible to be made navigable on a reasonable basis.

■ Considering the legal principles controlling here, I find that the Government has failed to carry its burden to establish that the Seneca is a navigable stream of the United States; and on the contrary I have concluded that the Commission was clearly correct in its findings and conclusions that said stream

was non-navigable; and that no useful channel for commerce ever existed on the Seneca at any time in its history.

A review of the evidence presented to the Commission by both parties indicates that there is a paucity of information relating to the question of the navigability of the Seneca River. Each party relied principally upon historical facts to sustain its positions.

The Government presented Dr. Gustavus G. Williamson, Jr., Associate Professor of Economics at the University of South Carolina, as an "historical witness". Landowner's expert witness in this area was Dr. Daniel W. Hollis, Professor of History at the University of South Carolina. Both of these witnesses were well qualified by background, training, and learning. Dr. Williamson concluded that there was navigability on the Seneca-Keowee River during the early nineteenth century, while Dr. Hollis expressed the opposite view that there never had been any substantial, economically useful navigation of the river. The factual testimony of both these witnesses were quite similar and generally based upon the same sources; however, each arrived at different opinions as to the stream's navigability.

The most significant historical evidence relating to navigation on the river, as testified to by both Drs. Williamson and Hollis, is as follows:

In 1791 the General Assembly of South Carolina passed an Act for opening and improving the navigation of several rivers throughout the State, including the Seneca and Keowee Rivers. In 1811 the South Carolina Legislature adopted legislation which recognized the assistance of boat sluices on the Seneca. In 1819 the Legislature established a Board of Public Works to take over the improvement of navigation on state rivers. In 1820 the Commission established by the 1819 legislation made its first report to the Legislature concerning possible improvements of navigation on several rivers. This report stated in part:

"An examination of the principal shoals of the Keowee River [Seneca-Keowee] was made during the summer. Portman Shoals where the River falls 52½ feet in 2 miles, present a serious obstacle to the improvement of this river. The fall is too great to be overcome by opening channels in the bed of the river, and the fact of the country near the banks is so broken and precipitous as to render any improvement by a canal and locks a very expensive undertaking not warranted by the extent of navigation above these shoals."

The Board of Public Works which was created by the 1819 legislation was headed by a Colonel Blanding around 1820. In a report to the Legislature about this time, Colonel Blanding considered the Seneca to be navigable, having but one difficult shoal in a distance of nearly 30 miles, that at Portman Shoals. He also noted that it was doubtful whether navigation could be effected for ascending boat traffic over Portman Shoals, but stated that boats carrying 40 or 50 bales of cotton had descended over the shoals from the mouth of Twelve Mile Creek. Colonel Blanding made a subsequent report in 1824 in which he told of a trip he made up the Seneca River; he reported essentially that all of the shoals in the river were very gradual and easily sluiced except at Portman Shoals, where the stream was rapid, much obstructed by rocks, with numerous ledges crossing the stream. He determined, however, that a sluice navigation through Portman Shoals could be rendered easier and safer than on many parts of the Savannah River. He entered at this time into contracts with the Lawrence brothers and Archibald Bowman to construct a sluice through Portman Shoals.

In 1828 the South Carolina Legislature passed another Act concerning the public works of the State, and provided that the Superintendent of Public Works should proceed to enforce the contracts entered into [by Blanding] respecting the navigation of the Seneca River. In 1829 Whitner, the Superintendent of

Public Works, reported to the Legislature as follows:

"On the 14th and 15th of October, I proceeded to make [the] examination of the Seneca. The sluicing of this river had been let out in two contracts, in June, 1824, to Archibald Bowman, and to James and Elisha Lawrence. The river was in a favorable state for the examination, being some inches lower than a common summer river, and the water very clear. I found that the contracts had been substantially complied with, except in a few instances, which it is not necessary to embody in this report. These defects in the work of the Messrs. Lawrence were pointed out to them on the spot, and on their agreeing to have the additional work done speedily, I have concluded to give them this opportunity before taking any other steps. In Bowman's work also, there was found some deficiency, but as his contract has been cancelled, I have only felt myself at liberty to request of him to do some additional work where it seemed most important, and which he has promised to do. * * *

"The river has been greatly improved by the work done on it, but in some instances the *benefit is confined solely to the descending trade, for in rendering that less dangerous, the ascending navigation has been made more difficult.* The great obstacle is Portman's Shoals, where, in one instance, the fall is upwards of six feet in about one hundred yards. In such a place, a straight sluice is necessary to enable boats to descend with safety, while a more winding course, by lengthening out and breaking the force of the fall, is just as necessary for ascending. *This navigation therefore can only be made to answer any very useful purpose, by having double sluices through the most difficult shoals.*" [Emphasis added].

This was the last report concerning State efforts to render the river navigable. It does not appear that the Federal Government ever undertook to study the stream's navigational possibilities, nor did it make any efforts to improve its navigation.

In addition to the official reports mentioned above, historical documents were introduced before the Commission, in which different individuals had spoken of the Seneca and Keowee Rivers as being navigable. The first of these reports, relied upon by Dr. Williamson, was a statement made some time prior to 1808 by a Dr. Edward Darrell Smith to the effect that the Seneca River and Portman Shoals had recently been made navigable, and that boats could be safely navigated down the Seneca to Augusta. Dr. Williamson however admitted that he found this statement in an appendix to a work entitled "Ramsay's History", and that historically speaking, this was a secondary source. Furthermore, Dr. Hollis during his testimony exhibited a petition signed by residents of the Pendleton area in 1821, seeking to have the Seneca River made navigable, and one of the signatures appearing on this petition was that of the same Edward Darrell Smith who had made the above statement prior to 1808.

The Government also relied upon a statement made in 1818 by one Robert Mills, a civil and military engineer, that the Seneca River was navigable for boats drawing 2 or 3 feet of water during the rainy season. There was another report by a Colonel Gresham, included in the papers identified as the "German Colony Protocol", in which he said in 1849 that the Seneca River was navigable for any boats that went from Augusta to Andersonville. However, Dr. Hollis stated that he could find no account of the German Colony using navigation on the Seneca River; and he reached the conclusion that such report above was made as an inducement to interest prospective settlers to come into the area.

There is no evidence of any traffic on the river by the early settlers or the Indians prior to the Nineteenth Century.

The only evidence of any actual commercial use of the river by boat was recounted by David Lawrence, witness for the Government who testified by deposition. He stated that his father and another man built a boat and used it to haul cross-ties and lumber over a 12 mile stretch of the river above Portman Shoals during a six year period ending about 1896. He also testified that there were some instances of logs being floated down the Keowee-Seneca above Portman Shoals. All of this use of the river was entirely intrastate, and there was no intimation in the record that it could have been extended through the hazards of Portman Shoals, so as to "form a continued Highway" over which commerce might be carried on with other states and foreign countries. The Daniel Ball, 10 Wall [U.S.] 557, 19 L.Ed. 999. Lawrence, who stated that he was 86 years old at the time of the taking of the deposition, also related a story about being told that his grandfather operated a trading boat along the Seneca River and navigated Portman Shoals. The defendant objected to this testimony as being hearsay, and not coming within the family history exception to the hearsay rule. The Commission refused to receive and consider this evidence. I concur with the ruling of the Commission in this regard. Considering all of the testimony of this particular witness, his advanced age, the fact that his account of his grandfather's boat does not appear in any historical source concerning the river, and his lack of detailed knowledge concerning the alleged operation of this boat, this legend would have little probative value and fails to meet the prerequisites of truthfulness and accuracy. Even assuming that this evidence is competent, I do not feel that it is sufficient to tip the scales in favor of navigability, nor does it establish that the Seneca was a useful channel of commerce.

The Government also contends that two rulings by the Federal Power Commission determining that the Seneca-Keowee River was navigable are conclusive on the court, if supported by substantial evidence. These rulings were issued ex parte and without evidentiary hearings. They did not represent a judicial determination. The same contention was made by the United States before the Fourth Circuit Court of Appeals in United States v. Appalachian Electric Power Co., 107 F.2d 769 [1939]. In rejecting this premise the Court said at page 791:

"In the first place, it is argued that in this proceeding the findings of the Commission with respect to navigability and the effect of the dam on navigability, and on interstate commerce, are conclusive if supported by substantial evidence, which is asserted to be the case here. It is not disputed that the case can be judicially considered de novo, but it is said that the ordinary rule that findings of an administrative tribunal must be accepted, if supported by substantial evidence, must control the decision here on the facts. In our view this contention is not applicable to the present case. Section 23 does not provide for a 'hearing' by the Commission when a declaration of intention to build a dam is filed, but only for an 'investigation' by the Commission. Nor does the Act provide for any judicial review of the findings made. Nor is this case a statutory proceeding by way of appeal from or review of the Commission's action. Assuming that the finding of the Commission is a relevant fact for the consideration of the court, and that it is entitled to careful and respectful consideration as the opinion of a body informed by experience, nevertheless it cannot properly be regarded as controlling judicial determination on the record in the case. Clearly the decision of the district court involved a constitu-

tional question of the jurisdiction of the Commission in relation to the distribution of state and federal power, and of riparian property rights of the defendant. This, we understand, is not disputed so far as the action of the district court was invoked under the Rivers and Harbors Act; and it seems equally clear that the same must be true with respect to any jurisdiction of the Commission in this case. In that view it is clear that the district judge was required to determine the question of fact *de novo* on the record made at the trial before him. Crowell v. Benson, 285 U.S. 22, 58, 59, 52 S.Ct. 285, 76 L.Ed. 598; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L.Ed. 1033; Baltimore O. R. Co. v. United States, 298 U.S. 349, 364, 56 S.Ct. 797, 80 L.Ed. 1209."

The decision of the Fourth Circuit in the above case finding the New River not to be a navigable stream of the United States was later reversed by the United States Supreme Court in 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243. The Government did not, however, in that case seek to have the court pass on the contention that the findings of the Power Commission should be conclusive if supported by substantial evidence and that proposition did not enter into the Court's decision. Therefore, I feel bound in the instant case by the principles enunciated by the Fourth Circuit in Appalachian, supra, as to the findings of the Federal Power Commission concerning the navigability of the Seneca-Keowee River. At most the Commission's findings as to navigability would constitute some evidence to be considered by the Commission and the court along with the other evidence in determining whether or not the Seneca was in fact navigable.

The Government contends that the evidence in the record, which has been briefly referred to herein, conclusively establishes that the Seneca was actually used for navigation in historic times; and that it was also suitable for additional improvement for navigation. It further contends that efforts by the State of South Carolina to improve or make the Seneca-River a navigable stream "dedicated" the river to interstate commerce. Finally, it argues that the Commission adopted an erroneous test of "useful commerce" in making the determination that the Seneca-Keowee River was not a navigable stream of the United States.

It is true that there was considerable discussion and planning on the State level as to effectuating improvements on the Seneca-Keowee River with the view of making the stream an useful artery of interstate commerce, particularly during the period 1808–1830 referred to by the historians as the "internal improvements period." The record also reflects that there were instances where boats descended the river down to Andersonville at the mouth of the Savannah River; however, the first report to the legislature in 1820 [set out in part above], after formation of a commission to study and make recommendations concerning improvements to make the Keowee-Seneca River navigable, reveals that state officials considered the necessary improvements to Portman Shoals too expensive considering the extent of navigation above these shoals.

Subsequent to this report efforts were made by Colonel Blanding to have the Lawrence Brothers and Bowman sluice Portman Shoals following his 1823 survey; however, this attempt was unsuccessful as documented by the report in 1829 of Whitner, Colonel Blanding's successor, which reported that useful navigation of the river could only be accomplished by making further improvements at Portman Shoals.

 It is my conclusion that the reports made to the legislature in 1820 and 1829 show that it was doubtful in the beginning of the "improvements era" that the Seneca could ever be made navigable for useful interstate commerce at a cost commensurate with need; and in spite of the statements by various in-

dividuals that the river was navigable, the last report in 1829 by Whitner shows that efforts to make the river navigable to ascending and descending boat traffic had failed; and that any improvements made at Portman Shoals had failed to open the river to useful interstate commerce. I cannot agree with Government's contention that efforts by the State during this period resulted in a "dedication" of the river to interstate commerce. Had the State succeeded in improving the stream so as to make it navigable for useful commerce, then the situation would be different. Once a stream becomes "navigable" it retains that status, but here the efforts of the State obviously failed. All of these facts were fully considered by the Commission.

 Of course, as aforesaid, the crucial test in determining navigability is not the actual commercial use of a river, or the absence of use. It is the susceptibility of the river for "useful interstate commerce" in its natural state or with reasonable improvements dictated by cost and need. United States v. Appalachian Power Co., supra. The Supreme Court has also asserted that use of a river by private boats may "demonstrate[s] the availability of the stream for the simpler types of commercial navigation." United States v. Appalachian Electric Power Co., supra; United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 [1931].

 The evidence in this case verifies that there had been some limited boat traffic on the river, and that it could in its natural state accommodate small flat boats. However, the only instances of trade and commerce carried on by boat were intrastate rather than interstate. Furthermore, the evidence indicates that the river was susceptible to having been made navigable at great cost by a system of locks and canals; but that the need definitely did not justify the cost during any period of history, prior to the coming of the railroad to the Piedmont, or thereafter to date of the development of the Hartwell Project. It

is therefore my judgment that the cost of making the Seneca navigable in the legal sense, and a useful artery of commerce, was so out of proportion to the use and benefits to be derived therefrom by the public that it was not reasonable or practicable to undertake such improvements.

It appears from the record that all of the witnesses, including those of the Government, reached the same conclusion.

 The Government contends, however, that even if the Seneca River is not a navigable stream, the flow of the stream is subject to the power of the United States arising under the Commerce Clause of the Constitution, because it is essential to the navigability of the Savannah River. There was no testimony in the record that the flow of the Seneca River in any way ever affected the navigability of the Savannah River. The only evidence presented showed that the Duke Power Plant at Portman Shoals and the operations of the Stevens Plant did not influence the flow or navigability of the Savannah in any manner. The Government argues, however, that if Duke Power Company had any right to maintain a dam on the river it could possibly have built a bigger dam, dredged out the river, etc., and thereby possibly affected the flow of the Seneca and in turn the Savannah. This court is bound by existing facts and cannot speculate and conjecture as to possible ways the Duke project under different circumstances may have affected the flow or navigability of the Savannah River. As it existed it had no influence on the Savannah, and consequently the United States had no paramount servitude nor greater interest in this non-navigable stream than did the landowners. United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 [1917].

I therefore conclude, in accordance with the above findings, that the United States had no paramount rights to the flow of the Seneca River; and that the question now remains as to whether Stevens had a property right in the flow

of the stream, which was taken by the Government; whether Stevens is entitled to be compensated by the Government for the loss of this "flowage right", if any; and whether the Commission's method of determining just compensation established a proper measure of damages.

The Commission was composed of three able and outstanding members of the South Carolina Bar, who performed their duties in a most creditable manner. Their Report clearly reflects that they had a complete understanding of the intricate and complex issues involved. Correct legal principles were applied by them to the facts in the case regarding the navigability of the Seneca River; its findings and conclusions in this regard were not clearly erroneous, but were amply supported by a preponderance of the evidence. Furthermore, as before stated I have made an independent study of the evidence and have reached conclusions of fact and law as stated herein. Inasmuch as the findings of fact and conclusions of law reached by the Commission are in accord with my own findings, and are supported abundantly by the evidence, they are hereby adopted and confirmed by this court.

The Government takes the position that if property rights in the flow of the Seneca River have been "taken" from the landowner the State is responsible, because the State and not the Federal Government reclassified the stream from a "C" to an "A" classification, thereby imposing the requirement for the waste disposal system. It argues that the sewer pipe which carried the landowner's waste from its plant was not inundated by the waters impounded behind Hartwell Dam, and that insofar as the Government is concerned the waste products can still be emptied directly into the reservoir without the necessity of the waste treatment facility; that such a requirement is purely a creature resulting from State action for which the Government is in no manner responsible.

In Town of Clarksville, Va. v. United States, 198 F.2d 238 [4th Cir. 1952],

cert. den. 344 U.S. 927, 73 S.Ct. 495, 97 L.Ed. 714, this same question was before the court upon a stipulation that the United States would provide a substitute sewerage system for the municipality. There the original sewerage system was rendered completely useless by the raising of the waters of the Roanoke River after construction of the Kerr Dam. The Government and municipality stipulated that just compensation for the loss of the public facility would be the cost of construction of a substitute system. Two questions left for judicial determination by the stipulation were: [a] Should the Government pay for construction of a sewerage treatment plant when none existed at the time of the taking, if such a plant is required by State law to be included in the substitute system; and [b] Should the Government pay for the cost of operating lift stations which must be added in a substitute system, but which were not necessary in the old system because it worked by gravity? The Court held that the Government must pay for the costs of the sewerage treatment plant and for the construction and maintenance of the lift stations, stating at page 243:

"It is the reasoning of the United States, adopted by the District Court [U. S. v. Certain Parcels of Land etc.], 104 F.Supp. [369] at page 372, that the condemnation proceeding had nothing to do with the necessity of the treatment plant, since the pollution was already present and since there is evidence that the Water Control Board was about to take action anyway.

"We do not agree with this interpretation. The Water Control Board took no positive action until after the condemnation was started. The taking was at least operative as both notice and spur to the Board to act. Moreover, it is apparent that the Board's policy was not to revoke or modify existing licenses until a sewer system was substantially changed. Certainly there is a strong inference that, without such

forced alteration by the Government, the Town could have operated under its present license for many years, if not indefinitely, without being required to build a treatment plant.

"We fail to see how it can logically be argued that the Government's action did not fasten this obligation upon the Town. The duty to build the plant was not present before the condemnation simply because it was not yet required, the Water Control Board's action being the sole determinant of its existence. The fact that there may have been just as much pollution under the old system as there will be under the new, about which there is much conflicting testimony, is not controlling. The pollution does not create the obligation; rather it is the action of the Board which has that effect. The liability the Town owes to the State is merely to comply with the Water Control Board's requirement of obtaining a license. It owes no responsibility to eliminate pollution until told to do so."

The Government argues, however, that the Clarksville case is not controlling herein for the following reasons. *First,* the Government stipulated in Clarksville, in accordance with the general principles of eminent domain concerning the taking of municipal facilities; that just compensation in the Clarksville case required construction of a substitute facility as good as that rendered useless by the taking; and that the duty to provide a substitute facility does not exist in the instant case, because the landowner is a private entity, and not a municipality. *Second,* the waste disposal system of the Utica-Mohawk Plant herein was not rendered completely useless, as in Clarksville; but to the contrary could, with some modifications, still discharge raw waste materials into the reservoir in the same manner as they were being discharged into the Seneca River and Martin's Creek; and that, therefore, if there is any duty on the part of the Govern-

ment to provide a substitute facility, this case would be controlled by the principles of law set forth in City of Eufaula, Ala., v. United States, 313 F.2d 745 [5th Cir. 1963]. In Eufaula, the Fifth Circuit held that the Government was not liable for costs of a sewerage treatment plant, required by State law after the taking, where none existed before the taking by the Government of a portion of the municipal sewerage system. The court found in that case that the original sewerage system would operate as well after the taking as before, and stated at page 749:

"The installation of one or more treatment plants as a *sine qua non* of the continued dumping of sewage into the river resulted not from any action or requirement of the United States, but from the exactions of the two States. It might be said that the raising of the water level precipitated or furnished the occasion for the inclusion of this new and different requirement by the two States, but it cannot be said that the United States, in any legal sense, caused it."

The decision in Eufaula, even if in conflict with Clarksville, is not apropos here, since that decision was predicated upon the dominant interest of the United States in a *navigable stream,* pursuant to the teachings of Twin City Power Co., supra.

In reference to the Government's first contention concerning the decision in Clarksville, the stipulation agreed that the items in question would be left for judicial determination; and in deciding what lawfully constituted just compensation the court was enunciating legal principles which this court and the Commission are bound to follow.

In the subject case, it is my opinion that the landowner is entitled to damages for its loss of "flowage rights" of the Seneca River if such were "taken" by the Government. The landowner does not contend that it could not with some modifications dispose of its waste materials after the taking, as before the

taking, if it were not for the requirement by the State that it build a treatment plant for its waste products prior to discharging same in the reservoir created by the Hartwell Dam. Therefore, the true measure of its damages is the fair market value of the "flowage rights" of the Seneca River, if such were taken by the Government.

The landowner then asserts that such "flowage rights" were taken by the Government, that it was damaged as a result, and that a proper and established method of evaluation of compensation for this loss is the market value of the remaining property reduced by the loss of the simple means of waste disposal enjoyed before the taking, considering the cost of construction and operation for a reasonable period of time of a substitute facility.

The Government asserts that the Commission should only consider the costs of certain necessary modifications to the original system necessitated by the impoundment of waters behind Hartwell Dam, because with these modifications Stevens could continue to discharge its raw waste products directly into the reservoir, insofar as the Government is concerned. Therefore, Government's position is that it would not be a proper measure of damages to consider the cost of a substitute facility since it was State action, not the United States, that required the construction of the treatment facility and the taking of the property rights in the flow of the stream.

 As to this contention, I follow the holding in Clarksville, supra, that it was Federal not State action that caused the landowner herein to incur the added expense of construction and maintenance of a waste treatment facility; and that its property rights in the flow of the Seneca River were taken by the United States. The taking of these valuable property rights by the Government has substantially damaged the landowner, and in my opinion it should be compensated by the Government in such a manner as "to be put in as good position as it would have occupied if its

property had not been taken". Town of Clarksville, Va. v. United States, supra; United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336.

Having concluded that the Government is liable for the full value of landowner's property rights in the flow of the Seneca River which have been taken from it, the court will now consider the Government's exceptions to the award made by the Commission.

 In reviewing the Commission's findings of fact as to just compensation, this court is bound by the findings of the Commission in the absence of manifest error, and unless clearly erroneous, in accordance with Rule 53 [e] [2] of the Federal Rules of Civil Procedure, made applicable here by Rule 71A [h], 28 U.S.C.A. United States v. Carroll, 304 F.2d 300 [4th Cir. 1962]; United States v. Certain Interests in Property, etc., 296 F.2d 264 [4th Cir. 1961]; Cunningham v. United States, 270 F.2d 545 [4th Cir. 1959], cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 [1960].

The Commission determined that just compensation to the landowner herein for loss of its original waste disposal facility, or "flowage rights" in the Seneca River, was an amount equal to the cost of construction of a substitute facility, and maintenance costs for a reasonable period of time. The Commission resorted to this measure of damages because it could not ascertain with any degree of accuracy the fair market value of the property loss suffered by the landowner. There were no available comparable sales of similar property rights upon which a fair evaluation could be based. The landowner attempted to show the market value of this loss through witnesses who testified as to the effect of the loss of the "flowage rights" upon the landowner's remaining property. These amounts were greatly in excess of the Commission's final award. The Commission rejected this approach, used the "substitute facility" approach, and limited the recovery to the costs of construction, the sum of $430,398.16; and the costs of operation for twenty years

capitalized at 6%, the sum of $118,942.-86; for a grand total of $549,341.02.

 The Commission found that the "cost of a substitute facility" method of evaluation of landowner's damages herein was the best of the four recognized appraisal methods.[3] I agree with the Commission that it used the most practicable method to evaluate the damages suffered by the landowner as a result of the Government's taking of its property. Town of Clarksville, supra. There is substantial evidence in the record to support fully this method of evaluation, and the amount of the Commission's award. The objections of the Government to the Commission's Report are hereby overruled, and the said Report is hereby confirmed.

It is, therefore, ordered that the title and easements described in the declaration of taking filed herein are vested in the United States of America; that the remaining just compensation due J. P. Stevens and Co., Inc., is the sum of $549,-341.02, together with interest from the date of taking, August 9, 1960, at the rate of 6 percent per annum, for which sum judgment shall be entered in favor of landowner.

It is further ordered that upon deposit by the United States of America of the sum of Five Hundred Forty-nine Thousand, Three Hundred Forty-one and 02/100 [$549,341.02] Dollars, with interest at the rate of six percent per annum from August 9, 1960, the Clerk of this court shall issue a Registry Fund check payable to J. P. Stevens and Co., Inc., for all deposits by the United States of America for the taking of its said property.

On page 8 of Volume 1 of the transcript of record in this case, the statement is made that the water intake and sewage disposal facilities of the landowner were constructed in advance of the raising of the water on lands taken in this proceeding with the understand-

ing as evidenced by two letters from Colonel W. A. Stevens, District Engineer, U. S. Corps of Engineers, that rights of way over Government property for the construction and maintenance of the facilities would be granted to the landowner by stipulation in this proceeding or by grant. No stipulation to accomplish this end appears in the record, and the Court was informed at the time of the argument of this case that no grant had been received. The Court retains jurisdiction of this cause only for the purpose of receiving such stipulations, or for the issuance of such further orders as may be appropriate to effectuate and consummate such agreement.

---

3. [a] Fair market value; [b] Income return or earnings [capitalization]; [c] Replacement costs less depreciation; and [d] costs of a substitute facility. Page 94 of Commission's Report.