The **CITY OF DEMOPOLIS, ALABAMA**
v.
The **UNITED STATES.**
No. 470–60.

United States Court of Claims.
July 17, 1964.

J. E. Palmour, Jr., Gainesville, Ga., for plaintiff.

David R. Warner, Washington, D. C., with whom was Ramsey Clark, Asst. Atty. Gen., for defendant. Arthur W. Ayers, Jr., was on the brief.

Before JONES, Senior Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

Plaintiff is an incorporated municipality situated on a bluff overlooking the Tombigbee River in Alabama. In 1904 it constructed and has since operated a gravity sewage disposal system, consisting of drainage pipes running throughout the city and emptying into the river through three outfalls. Through these outfalls, plaintiff has discharged its raw sewage into the river.

Both parties admit that the river is a navigable stream.

In section 2 of the Rivers and Harbors Act of 1945, 59 Stat. 10, 17, Congress authorized the construction of the Demopolis Dam and Lock Project. Pursuant to this authority, defendant constructed a dam downstream from the City of Demopolis. The dam, which was completed in 1954, raised the level of the river opposite the city, reduced its rate of flow and created a lake of substantial surface area. The lake's potential as the basis for recreational use, coupled with the fact that the decreased rate of flow retarded dispersal of plaintiff's untreated sewage, caused the State of Alabama to object to the continuance of plaintiff's method of sewage disposal. The State's Water Improvement Commission has required that plaintiff build a plant for the treatment of its sewage before disgorging it into the river. Plaintiff says that the cost of constructing and operating this facility will be $950,052, for which sum it sues on the ground that its present system has been wrongfully "seized" by defendant.

█ The rights of a riparian landowner to use a navigable waterway are subject to the paramount right of the Federal Government to improve navigation in it. This right extends to the entire bed of the stream up to ordinary high water mark. To this extent, it has been held many times, that the right of the United States to the bed and flow of a navigable river is superior to that of

any other competing interest. The latest decision so holding is United States v. Virginia Electric & Power Co., 365 U.S. 624, 627–628, 81 S.Ct. 784, 787–788, 5 L.Ed.2d 838 (1961), in which the Supreme Court summarized this doctrine and its consequences as follows:

"This navigational servitude— sometimes referred to as a 'dominant servitude,' Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 686], or a 'superior navigation easement,' United States v. Grand River Dam Authority, 363 U.S. 229, 231 [80 S.Ct. 1134, 1136, 4 L.Ed.2d 1186]—is the privilege to appropriate without compensation which attaches to the exercise of the 'power of the government to control and regulate navigable waters in the interest of commerce.' United States v. Commodore Park, 324 U.S. 386, 390 [65 S.Ct. 803, 805, 89 L.Ed. 1017]. The power 'is a dominant one which can be asserted to the exclusion of any competing or conflicting one.' United States v. Twin City Power Co., 350 U.S. 222, 224–225 [76 S.Ct. 259, 260–261, 100 L.Ed. 240]; United States v. Willow River Power Co., 324 U.S. 499, 510 [65 S.Ct. 761, 767, 89 L.Ed. 1101]. * * * "

The outlet in the river for plaintiff's sewage system was much below high water mark, as plaintiff has admitted.

Plaintiff's claim is not for the physical destruction of its sewage system by the flooding of land above the ordinary high water mark. As plaintiff admits, its sewage system is still capable of operating in the same manner, and with the same efficiency, as it has operated since 1904. The damages that plaintiff claims spring entirely from the altered flow of the Tombigbee River. The construction of the dam causes the waters to flow more slowly, which retards the washing away of the raw sewage, and makes necessary the treatment of the sewage before it can be discharged into the river. But the United States had the unrestricted right to the full use of the flow of the river to the exclusion of any other party, and to change its flow in the improvement of navigation without compensating any riparian owner or user. Plaintiff cannot now complain because defendant has exercised that right. It is not entitled to compensation under the Fifth Amendment, and defendant's motion is granted as to the first count of its petition.

In the second count of its petition, plaintiff has asserted a statutory cause of action founded upon the Congressional declaration of policy contained in section 1 of the Rivers and Harbors Act of 1945, supra, which reads:

"That in connection with the exercise of jurisdiction over the rivers of the Nation through the construction of works of improvement, for navigation or flood control, as herein authorized, it is hereby declared to be the policy of the Congress to recognize the interests and rights of the States in determining the development of the watersheds within their borders and likewise their interests and rights in water utilization and control, as herein authorized to preserve and protect to the fullest possible extent established and potential uses, for all purposes, of the waters of the Nation's rivers; to facilitate the consideration of projects on a basis of comprehensive and coordinated development; and to limit the authorization and construction of navigation works to those in which a substantial benefit to navigation will be realized therefrom and which can be operated consistently with appropriate and economic use of the waters of such rivers by other users." [59 Stat. 10]

Plaintiff argues that this provision gives a cause of action to riparian landowners who have been damaged by the construction of projects which the Act authorizes.

The sole function of this provision was to encourage cooperation between the National Government and the several States in planning and constructing the public works which the Act authorized. It is obvious that it was not intended to give to a riparian user a right of action it did not have before.[1] The position of the State of Alabama has been contrary to that of the plaintiff. Acting through its Water Improvement Commission, the State has said that the construction of this dam was beneficial to its interests and that plaintiff must defer to the new uses of which the river is now susceptible. Accordingly, we must hold that plaintiff cannot recover on this count of its petition and that defendant's motion must be granted as to it.

In its petition and brief plaintiff sought damages only for the loss of use of its sewage disposal system and asked no relief for the flooding of municipal land above the ordinary high water mark of the river. At oral argument, however, plaintiff requested and was granted leave to amend its petition to add a third count, alleging that a strip of land above the high water mark, known as Arch Street, had been "taken" by defendant. Unlike plaintiff's other claims, this count cannot be disposed of at this stage of the proceedings. Plaintiff might be entitled to recover upon this count if the facts show that a compensable flooding occurred and that plaintiff was damaged by reason of such flooding. Plaintiff will have thirty days from the date this opinion is rendered to make a formal written amendment of its petition, sufficient to show a taking of property above high water mark, in which property it had a compensable property right.

Defendant's motion for summary judgment is granted and the petition is dismissed with respect to the claims asserted in counts one and two of the petition. Defendant's motion as to the additional count permitted in the preceding paragraph is denied, and the case is returned to the trial commissioner for further proceeding pursuant to Rule 47(c).

---

1. Section 1 of the Act was proposed on the floor of the Senate by Senator O'Mahoney. The Senator denominated his amendment as "a declaration of policy to recognize the rights of the States" and stated that its purpose was to "write into law a policy with respect to cooperation in the drafting of plans, which the States do not now have. To that extent," he added, "it is in addition to existing law." 90 Cong.Rec. 8488 (1944).