TRI–STATE MATERIALS
CORPORATION et al.

v.

The UNITED STATES.

No. 119–73.

United States Court of Claims.

Feb. 23, 1977.

John P. Arness, Washington, D.C., attorney of record for plaintiffs. George W. Miller, Gail Starling Marshall, Dwight D. Meier, Washington, D.C., and Rudolph Janata, Columbus, Ohio, of counsel.

Hubert M. Crean, Washington, D.C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D.C., for defendant.

Before SKELTON, KUNZIG and BENNETT, Judges.

### ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge:

This case, before us on plaintiffs' motion for summary judgment, presents a novel question. If the Government builds a dam with intent to enhance a waterway's navigability, and in so doing raises the water table of land lying outside its bed to a level where drainage is restricted and subterranean flooding results causing economic loss to the landowner, is the loss compensable as a Fifth Amendment taking?[1] While this question is rephrased in several ways by the parties herein, our answer to the generic question and to plaintiffs' request for summary judgment is in the affirmative.

This case also involves the complicated issue of the Government's navigational servitude—the sovereign's right to rule the navigable waterways of the land unimpeded by private ownership rights. A subject of much confusion, the extent of the Government's navigational servitude will hopefully be more clearly defined by this opinion.

The plaintiffs, Tri-State Materials Corporation, Letart Corporation and Bownemont Corporation, are the owners in fee of ap-

---

1. The facts of this case, as hereafter set out, pose a situation of first impression. While compensation has been allowed for damage caused by subterranean flooding to surface land beyond the bed of a navigable stream, we can find no case where the land *itself* was subterranean. In the instant case, the land was subterranean—a sand and gravel mine.

proximately 800 acres of land in Meigs County, Ohio. Since 1960, the plaintiffs have conducted a sand and gravel extracting business on part of the property. On November 7, 1969, defendant acquired title to a portion of plaintiffs' lands by condemnation, exercising the eminent domain statute, 46 Stat. 1421 (1931), 40 U.S.C. § 258a et seq. (1931). This land was taken pursuant to the defendant's construction of the Racine Locks and Dam Project (hereafter Project) in the Ohio River as the lands were to be permanently flooded upon completion of the Project. On March 2, 1972, the plaintiffs herein were granted money judgments in this condemnation action. The judgments included an express reservation by plaintiffs herein for any taking of or damage to any other lands of plaintiffs. This reservation included the mining properties, now the subject of this dispute, which were used in plaintiffs' sand and gravel extracting business.

Subsequent to the completion of the Project, the land in question subflooded. The water table level rose from 538 feet mean sea level (hereafter msl) before the Project's construction to 560 feet msl afterwards. This 22-foot raise in the ground water table has impaired the ease and profitability of extracting the sand and gravel from the mine. The extent of the impairment (alleged to be total by plaintiffs) is the subject of factual dispute and can be resolved by a trial judge in a separate determination. Ct.Cl. Rule 131(c). The issue before us is whether the impairment is compensable as a matter of law.

Although it is undisputed that the Government action precipitated the subflooding, the Government contends that this subflooding was only temporary. To this date, the water table level remains at 560 feet msl, but the Government argues that natural water forces from non-Government sources have overcome and replaced the Government floodwaters. Essentially, the Government is contending that "its water" has receded and been replaced by "other water."

The Government also says that the 22 feet of permanent flooding is not due to "sub-flooding", but due to "the blocking of drainage within the banks of the Ohio River," and that blocked drainage is a noncompensable taking.

The Government further argues that the flooded mine is noncompensable because of the existence of the Government's navigational servitude. The existence of the servitude preempts any right to subterranean drainage within the bed of a navigable river.

Defendant's alternative argument is very complicated. It appears to be as follows: Of the 22 foot raise in the water table (538 feet msl to 560 feet msl), the first 16 feet (538 feet msl to 554 feet msl; 554 feet msl being the ordinary high water line) is noncompensable by virtue of the exercise of the Government's navigational servitude. So, while the navigational servitude preempts recovery for blocked subterranean drainage within the bed of a navigable river (supra), says the Government, it also precludes recovery for a raise in the water table to the point of the ordinary high water mark.

As to the other six feet of water (the increment from the ordinary high water mark to 560 feet msl), defendant poses two theories. First, defendant asserts that the mining operation was already rendered worthless by the 16 feet of flooding (noncompensable by virtue of the navigational servitude). The extra six feet of water which is *not* protected by the navigational servitude, therefore, caused *de minimis* damages. Concisely stated, plaintiffs' mining operations became no more commercially impractical when the sand and gravel was submerged by 22 feet of water than when submerged by 16 feet of water. This argument has a logical appeal, and we find ourselves in agreement with defendant. Their syllogism is premised on the assumption that the initial 16 feet of flooding is noncompensable when measured against the navigational servitude. If the 16 feet of water *is* compensable, defendant's logic is equally appealing—the extra six feet would probably not significantly increase

the impracticality of the mining operations. The question of damages for the last six feet of water table increase becomes then, for all practical purposes, irrelevant, and our focus must be upon the 16 feet issue.

Defendant's second theory concerning the six feet of flooding above the ordinary high water mark is that raising the water level above the ordinary high water mark is not compensable when the damage is a loss of ground water drainage. First of all, we have just determined that the damage issue for the six feet is irrelevant. Secondly, we see little difference between this argument and defendant's initial assertion that the mine was not destroyed by subflooding, but by a lack of drainage and, therefore, is noncompensable. We now turn to defendant's initial assertion that the flooding is now caused by non-Governmental water and is thereby noncompensable.

The Government most adamantly asserts that the present flooding waters are not waters emanating from the Government source (the Racine Locks and Dam Project). It admits, however, that the original floodwaters were indeed its own. Those waters were "subsequently overcome by the natural water forces within the watershed of the subject lands." Defendant's Opposition to the Motion for Summary Judgment, p. 2. The Government has conducted many tests showing that the water currently flooding the mine did not originate from the Ohio River, but rather is water working towards the river from a higher elevation.

The Government's tests do little more than illustrate the normal gravitational displacement of water from higher sources to lower sources—from hills to streams to rivers and finally to the sea. Whereas prior to the raising of the water table, the gravitational flow of water would have occurred at a deeper subterranean level and not impaired the mining operations; the Project has raised the water table, resulting in the gravitational flow of water at a higher subterranean level, thus impairing the mining operations.

The Government asks us to adopt the proposition that compensation for the destruction of property resulting from subterranean flooding is not appropriate in this case, as only when the flooding is permanently caused by "Government water" is there a Government taking within the terms of the Fifth Amendment.

Emphasis upon whose water is currently flooding the mine is misplaced. This court has focused in the past on the permanent *effect* of Government action.

*United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950) affirmed by a 5-4 majority the holding of this court that a dam which raised the water table level causing underflooding of plaintiff's land, retarding the drainage rate of the land's surface and subsurface waters, and destroying it for agricultural purposes, was as compensable as a surface flooding would be. The Supreme Court found in *Kansas City* that the land was permanently invaded by the percolation of waters from both the "Government water" (the river) and from "non-government water" (the tributaries). It said:

The continuous presence of this raised water table also blocked the drainage of the surface and subsurface water in a manner which helped to destroy the productivity of the land. Whether the prevention of the use of the land for agricultural purposes was due to its invasion by the water from above or below, it was equally effective. (339 U.S. at 810, 70 S.Ct. at 891)

This court made it clear in *Wilfong v. United States*, 480 F.2d 1326, 1329, 202 Ct.Cl. 616, 622 (1973), that the permanence of the *consequences* of the Government act is controlling, and there is no additional requirement that the *instrumentality* of the consequence be purely a governmental one:

From these authorities [flooding cases] we extract the principle that to support a Fifth Amendment taking via inverse condemnation there must be not only a Federal activity or project which is permanent in nature, but that such activity or project must impose on private property certain consequences which are themselves permanent, and that their recur-

rence is inevitable even if only intermittent.

In the case at bar, the Project is certainly permanent in nature and the consequences —22 feet of subflooding—are permanent.

This court in *Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579, 207 Ct.Cl. 323 (1975), further articulated the rule of *Kansas City:*

> [I]f an action taken by the Government to improve the navigability of a navigable stream raises the water level in the stream and thereby causes it to overflow or *otherwise damage* property situated *outside the bed* of such stream, the Government is liable for the ensuing damages. (518 F.2d at 583, 207 Ct.Cl. at 331) (emphasis added)

In the case at bar, the mine located outside the bed of the river was "otherwise damaged" by subflooding caused by a raised water table.

The defense asserted here by the Government is not only inconsistent with the *Kansas City* and *Goose Creek* cases, but was specifically rejected by this court in 1969 in *Fromme v. United States*, 412 F.2d 1192, 188 Ct.Cl. 1112 (1969). In *Fromme*, this court held for the Government after finding no permanency in the flooding complained of and that the plaintiffs' land would recover its economic value as grassland within two or three years. However, the court expressly stated that where Government construction causes permanent flooding of land of another, there is a taking for which the Government must pay conpensation, and:

> . . . In this connection, it would seem to be immaterial whether works constructed by the Government cause the permanent flooding by backing water upon the affected land or by preventing water which originates elsewhere from draining off the affected land. (412 F.2d at 1196, 188 Ct.Cl. at 1118)

■ In the final analysis, then, it makes no difference whose water ultimately constitutes the flood waters. We need not answer the question left open in *Kansas City* as to Governmental liability for flooding where Governmental waters never invaded the subject lands, for here the water from the Ohio River did indeed comprise the initial floodwaters. If we look to the consequences of the Project in the case at bar, we see a but/for relationship to the permanent flooding. This is all that is required. In *Goose Creek*, the Government caused the water table to rise so as to disallow drainage of rain water. We held a compensable taking occurred. Viewing the facts here in the context of *Goose Creek*, the only difference in this case appears to be that the source of the subsurface flooding waters was run-off water from higher ground and not rain water. In both cases, Governmental action caused the water table to rise to the point of prohibiting the land's previous uninhibited drainage.

■ The above authorities also refute the Government's contention that Governmental action resulting in blocked or impeded drainage is noncompensable. *United States v. Kansas City Life Ins. Co., supra; Fromme v. United States, supra; Goose Creek Hunting Club, Inc. v. United States, supra.*

We now turn to the Government's various contentions regarding the navigational servitude.

■ *United States v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941), provided the standard definition of the sovereign's navigational servitude. The Government was held to have the power to invade property rights in land within the bed of a stream (which includes all lands below the ordinary high water mark) without paying compensation when the purpose of the invasion was to aid in the navigability of the stream. *Accord, Oregon v. Corvallis Sand and Gravel Co.,* —— U.S. ——, ——, ——, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977).

Thus we do not believe that the navigational servitude is operational in this case for any of the reasons argued by the Government. Essentially, defendant places major reliance on just two issues, both of which we reject as follows: First, the lands

at issue are not part of the bed of a navigable stream and are, therefore, outside the normal scope of the navigational servitude. Second, since the value claimed to have been taken does not derive from access to or use of a navigable stream, the navigational servitude does not serve to limit the amount of damages.

■ It is conceded by all parties that the land at issue in this litigation is "fast" land, that is, land beyond the bed of a navigable stream. The bed of a navigable stream includes the adjacent banks up to the ordinary high water mark. Land within the bed is always subject to (or burdened with) the potential exercise of the navigational servitude. An owner of such land may not claim compensation when the Government takes the land pursuant to aiding the navigability of the stream. *United States v. Chicago, Milwaukee, St. Paul & Pacific R.R., supra.*

Essentially, the Government is arguing the position put forth by the four dissenting Justices in *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950). The dissent there challenged the validity of distinguishing between owners of land within the bed and owners of land outside the bed. The dissenters felt that the rule of the navigational servitude (and the corresponding rule of no compensation) should be applied to all landowners.

It would be incongruous to deny compensation to owners adjacent to navigable rivers and require it for others bordering their tributaries for like injuries caused by the single act of lifting the river's mean level to the high-water mark. Because water seeks its own level, raising the level of the river necessarily raises that of the tributary at their conjunction and as far upstream on each as the effects of the lifting may go. These facts are equally apparent to both types of owners. We think they should be anticipated by both, and that the one has no more power to obstruct or burden the power of Congress in its control of the river's bed in the interest of navigation than the other. Neither has any greater right to have the river flow in its natural state than the other. (339 U.S. at 812, 70 S.Ct. at 893)

■ We are, of course, bound by the majority opinion of the Supreme Court, and not by the dissent, despite certain logical appeal of Justice Douglas' words. We might comment, however, on Justice Douglas' premise that both sets of landowners can equally anticipate Governmental invasion by exercise of the navigational servitude. It seems unlikely that plaintiffs in this case could have anticipated such a direct impact. One who operates a mine within the bed of a navigable stream may assuredly be on notice of or anticipate a potential invasion, but one outside the bed, at least, has *less* notice or a lessened anticipation. As the distance from the bed increases, the notice and anticipation, it seems to us, would lessen proportionately. At some distant point from the river's bed, there would be no notice or anticipation of Governmental exercise of the navigational servitude. Rather than construct a rule which would require the court to determine the amount of compensation based upon the degree of subjective notice or anticipation of a Governmental invasion, and rather than construct a per se rule that *all* landowners be on notice and anticipate an invasion, the majority of the Supreme Court chose a middle, albeit imperfect, scheme of compensation. Those within the bed are subject to the navigational servitude and will not recover. Those beyond those limits are not subject to the navigational servitude and may recover.

■ Our second reason for holding the navigational servitude defense inapplicable to the case at bar is that the value claimed to have been taken does not derive from access to or use of a navigational stream.

The Government attempts to fit the facts of this case into the mold of certain cases discussed in depth, *infra*.[2] In each of these

2. *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240

"river cases," plaintiff had a riparian use or interest in the continued status quo of the stream. The riparian uses were held subordinate to the Government's navigational servitude. Essentially, the Government suggests that subterranean drainage is a riparian right, subordinate to the navigational servitude, and, therefore, Governmental blocking of subterranean drainage is a noncompensable invasion.

Once this argument is made, it becomes clear why the Government so adamantly seeks to distinguish between "subflooding" and "blockage of drainage." Not only do we think the distinction is a weak one, we believe that even if the distinction were accepted, the purview of the navigational servitude is not so broad as to preclude recovery for plaintiffs' damage in this case.

The law should, when possible, reflect a common sense logic. It defies common sense to differentiate between subflooding and blockage of drainage. They are one and the same. Any farmer recognizes that, as does any miner. For the law to glorify a semantical distinction to the extent of providing a remedy for one and not for the other is to promote form over substance, and academics over common sense.

A flood *is* a flood precisely because drainage is inadequate to allow adequate percolation in to subterranean resting places. The ground has achieved its maximum saturation point, and the water above ground can drain nowhere. Before a river overflows its banks, the water table rises. The ground below the river and to the sides of the river acts as a sponge, absorbing its full capacity of excess waters. When the flooding finally occurs, the water level beneath the surface of the adjoining lands has been raised. The drainage of the flood waters to the soil below is impeded by the existence of a raised water table. Were the water table lower, the flooding might be eliminated by virtue of the greater absorption potential. It is, therefore, possible to charac-terize the flood as not really being a flood at all, but merely a drainage problem. The concept is no different for subterranean flooding, which in this case was as deleterious to the mine as a surface flooding might be to a farm. We, therefore, find the Government's purported distinction to be ill-conceived and reject it.

Even if we were to concede that the distinction between subflooding and blocked drainage were proper, the Government does not succeed in enveloping the case at bar with the cases it cites.

█ We have earlier held that land such as plaintiffs' which is not part of the bed of the stream is not subject to the navigational servitude per se. However, where the property values and uses are *riparian*, the cases cited by the Government show that the value attributable to the access to or direct riparian use of the water is to be excluded from the compensation equation.

In *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), plaintiff operated a hydroelectric plant on a non-navigable stream, the Willow River, which ran close to its conjunction, the St. Croix River. When the Government built a dam on the Mississippi River into which the St. Croix flowed, the end result was a three-foot raise in the ordinary high water level at the plaintiff's property, reducing the hydroelectric facility's production. The Supreme Court disallowed a recovery, despite the fact that plaintiff's land was "fast land." The rationale of that decision seems to be that the right to the water itself for purposes of manufacturing power is subordinate to the navigational servitude, and noncompensable.

The facts and holding of *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), are similar to those of *Willow River*. Again, the fast lands' value was claimed to be decreased by Governmental action altering the flow of a

(1956); *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945); *Borough of Ford City v. United States*, 345 F.2d 645 (3rd Cir. 1965); *City of Demopo-

lis, Alabama v. United States*, 334 F.2d 657, 167 Ct.Cl. 94 (1964); and *City of Eufaula, Alabama v. United States*, 313 F.2d 745 (5th Cir. 1963).

river. Plaintiff again had hydroelectric operations dependent upon the maintenance of the status quo of the river. The Court said:

> . . . the landowner here seeks a value *in the flow of the stream*, a value that inheres in the Government's servitude and one that under our decisions the Government can grant or withhold as it chooses. It is no answer to say that payment is sought only for the location value of the fast lands. That special location value is due to the flow of the stream; and if the United States were required to pay the judgments below, it would be compensating the landowner for the increment of value added to the fast lands if the flow of the stream were taken into account. (350 U.S. at 225–226, 76 S.Ct. at 261; emphasis in original).

Basically, the Court's holding was that the flow of the river was subject to the navigational servitude and the owners of fast lands could not be awarded compensation *for their interest in that flow* if the Government caused the flow of the river to be altered. The Government had, in effect, provided the source and means for the hydroelectric plant's economic viability and could freely remove the source.

*United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961), again involved a water power development, but the damage to plaintiff's property also included uses of the property not associated with the flow of the river. These non-riparian damages were held compensable, while the riparian uses were held noncompensable.

The three other cases cited by the Government, *Borough of Ford City v. United States*, 345 F.2d 645 (3rd Cir. 1965); *City of Demopolis, Alabama v. United States*, 334 F.2d 657, 167 Ct.Cl. 94 (1964), and *City of Eufaula, Alabama v. United States*, 313 F.2d 745 (5th Cir. 1963), all deal with the taking of property used for sewer disposal involving direct use of the flow of navigational streams. Recovery was denied in each.

The unifying principle of these cases is that the only effect of the navigational servitude upon a claim for a taking of lands beyond the bed of the stream is to exclude the value attributable to the riparian uses of the navigable stream.

Unlike the three "power plant" cases and the three "sewer flow" cases, plaintiffs in the case at bar make no special riparian use of the navigable stream. They do not claim a loss for harm done to hydroelectric power operations or artificial sewage flow. Nor do they claim a loss for any other riparian use such as, perhaps, fishing, irrigation, or use in a chemical plant's processes.

We fail to see how the enjoyment of the *natural drainage* of water into the earth and the gravitational flow of that water to a river and finally to sea is comparable with the *unnatural*, man-made uses of a river described by the six cases discussed above. The processes of natural drainage from plaintiffs' lands into the bed of the river have doubtless been present since the glaciers carved out the river basin. Plaintiffs never made *affirmative* use of the flow of the Ohio River. Drainage, like the air the miners breathed, had always existed for the entrepreneurs who founded the sand and gravel mine. The land in question was not chosen especially for the drainage value of the nearby river. Plaintiffs exercised no artificial riparian interest in the flow of the navigational servitude as did the plaintiffs in the cases cited by the Government. This, in combination with the fact that the lands lie beyond the boundaries of the Ohio River bed, takes the lands out from under the navigational servitude.

Therefore, even if we agreed to accept the Government's characterization of the damages in this case as being caused by blocked drainage and not subflooding, we cannot hold that natural drainage is a noncompensable riparian interest.

The Government contends that a decision for the plaintiffs in this case will cause irreparable harm to the Federal Government—that the navigational servitude will be gravely limited. We cannot agree. We believe that the facts of this case are rela-

tively unique and that this opinion does not represent an unwarranted extension of *Kansas City* and *Goose Creek.* Our decision, in summary, is as follows:

Defendant's argument that natural water sources have replaced the original Governmental floodwaters and, therefore, compensation is not required must fail. *United States v. Kansas City Life Ins. Co., supra; Goose Creek Hunting Club, Inc. v. United States, supra; Fromme v. United States, supra.*

By virtue of the same authorities, Governmental action creating a blockage of drainage is a compensable taking. The navigational servitude is not relevant to the facts of this case.

Accordingly, since there has been Governmental action in this case resulting in permanent damage to the plaintiffs, we grant the plaintiffs' motion for summary judgment and remand the case to the trial division for a determination of damages under Rule 131(c).