**M.R.K. CORPORATION, and Cliff and Dorothy Mortensen, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 493–83L.

United States Claims Court.

Sept. 15, 1988.

Thomas S. Hayward, Seattle, Wash., for plaintiffs.

Susan V. Cook, Lynn A. Johnson, and Robert W. Rodrigues, with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This takings case is brought under the Fifth Amendment to the Constitution and 28 U.S.C. § 1491 (1982). Plaintiffs, M.R.K. Corporation and Cliff and Dorothy Mortensen (MRK), are seeking just compensation for a flooding of certain areas of their property, allegedly by the United States. After consideration of all of the evidence presented at trial, and the parties' post-trial submissions, the court finds that the plaintiffs have not met their burden of proving that the United States is the direct and proximate cause of the water damage of which plaintiffs complain. Their complaint must therefore be dismissed.

## FACTS

The MRK land is located in a portion of the State of Washington known as the Columbia River Basin. The basin is the site of a large irrigation project known as the Columbia Basin Project, part of which is the alleged cause of the inundation at issue here.

The central structure of the Project is the Grand Coulee Dam. This dam blocks the flow of the Columbia River and creates

the 151 mile long Franklin D. Roosevelt Lake. Below the dam a portion of the water is lifted 288 feet through a feeder canal into the Banks Lake storage area. This water then moves southward through the Bacon Tunnel and then a main canal to a bifurcation works. The bifurcation works is a system designed to direct water into the various canals. From this bifurcation works the water leaves the control of the United States and moves through either the eastern canals, which direct water to the East Columbia Basin Irrigation District, or through the western canals, which direct water to the Quincy Conservation and Irrigation District. All canals direct water in a southerly direction following the general slope of the land.

In the central portion of the geographic area of the project, but unconnected to the network of canals, lies Moses Lake. Moses Lake is a naturally occurring lake fed, at least in part, by Rocky Ford Creek to the north, and by Crab Creek, via Parker Horn[1], further to the south. The water level in Moses Lake varies between 1,043 feet and 1,047 feet above mean sea level.

Directly south of and connected to Moses Lake lies the Potholes Reservoir. The reservoir is created by O'Sullivan Dam, and covers a forty-five square mile area. The O'Sullivan Dam was built across Drumheller Channel which was, before the dam, the natural point of drainage for the land to the north. Thus, Potholes Reservoir is uniquely situated to catch the natural water runoff from the Columbia River Basin. This runoff includes both underground and aboveground irrigation return flow, as well as some water returned directly from the east and west canals. Potholes Reservoir can in some ways be thought of as a giant sink for much of the basin, accumulating water during part of the year and returning it to the region during other parts. The relevant portions of the Columbia River Basin discussed above are reflected, although not to scale, in the map below. The inset from defendant's Exhibit 15 shows, in the dark area, the general location of the Project within the State of Washington.

1. Parker Horn is a horn shaped extension of Moses Lake around which the city of Moses Lake is built. It is located, along with Pelican Horn, on the southeastern section of Moses Lake.

(inset)

Water storage in Potholes Reservoir began in 1951. From that date the depth of Potholes gradually increased. Plaintiffs' Exhibit No. 3, graphs of the maximum and minimum annual water stage readings of Potholes Reservoir, indicates that in 1952 the maximum level of Potholes was about 1,020 feet. From 1957 the maximum reached a peak of 1,044 feet after a continual increase from the 1952 maximum level of 1,020 feet. From 1957 to the present, the level has been relatively stable with the maximum varying between 1,039 feet and 1,046.5 feet. The minimum levels reach their highest in 1956 rising to 1,035 feet. From that point on they steadily declined

until the mid–1960's reaching a low of 1,022 feet. Since that time they have varied back and forth between 1,022 feet at the low and 1,035 feet at a high. Generally, Exhibit No. 3 shows a very slight increase in the maximum yearly depth of Potholes Reservoir from 1957 to 1980. There is also evidence that Potholes has recently been maintained at the higher levels for longer periods of time than in the past.

Potholes Reservoir is hydraulically contiguous [2] with a gravel aquifer [3], known as the Mae Valley Aquifer. This aquifer extends to the community of Moses Lake and allegedly to part of the plaintiffs' property. Potholes is also hydraulically contiguous with a well, number 30 P/Q, which is located southwest of plaintiffs' property, presumably in the aquifer.

The plaintiffs' property covers approximately thirtynine acres and is located about five miles northeast of Potholes Reservoir adjacent to the southern portion of Moses Lake at the very tip of Pelican Horn (see map). The property is shaped some-what like a square. It is bordered on the west by Division Street and on the east by Pioneer Way. To the north the property is bordered by a residential area through which both Alder and Balsam Streets dead-end into the MRK property. On the south border, the area of highest ground, is the community of Garden Heights.

The MRK land varies in elevation from 1,046 feet [4] to 1,120 feet above mean sea level. The lowest elevation is on the northern portion of the land. Water thus flows towards the northern portion of the land and eventually into Moses Lake. Currently, the land contains three ponds located along the northernmost areas of the property. Numerous other areas on the property are best described to be wetlands as indicated by the presence of cattails and other water-dependent grasses. The above is reflected in plaintiffs' Exhibit No. 15, a map of the MRK property which is reproduced below. This map also indicates the height (in feet) above mean sea level of selected wells on or near the MRK property.

2. "Hydraulic continuity" or "hydraulically contiguous" means "that the second body of water is associated in such a way to the first such that changes in the elevation of the first are ultimately reflected in measurable corresponding changes in elevation of the second body of water." Defendant's Opening Post-trial Brief at 26.

3. An aquifer can be thought of as a porous region of rock and gravel which can store large volumes of water.

4. This is approximately at the property's minimum height, only one-half foot below the maximum possible height of Potholes Reservoir, set at 1,046.5 feet pursuant to a 1970 agreement between the Bureau of Reclamation and the Moses Lake Irrigation and Rehabilitation District (see Defendant's Memorandum of Contentions of Fact and Law at 4). Exhibit 3 shows that the maximum height has been attained three times since the opening of Potholes Reservoir, once in 1969, once in 1974, and again in 1980. However, the level of Potholes has remained at maximum for short periods of time only.

Although the current water level on the MRK property is high, this is not a recent development. Rather, there is substantial evidence indicating that the property was wet as early as 1949. William Seevers, a government expert, testified from a 1949 aerial photograph that a pond was present directly across Division Street from the property.[5] He also testified that the prop- erty itself contained some wet soil and wa- ter-dependent grasses as indicated by dark areas on the photograph. Mr. Seevers fur- ther testified from a 1961 aerial photo- graph that a large pond had developed on the northwestern corner of the property directly across Division Street from the pond present on the 1949 photograph. The

5. Mr. Seevers is Vice President and Senior Sci- entist with the consulting firm of Geraghty & Miller. He has a masters degree in geology/hy- drogeology from the University of Kansas, and has been actively working in his field since 1960 when he was a member of the Water Resources section of the Kansas Geological Survey. Mr. Seevers has been with Geraghty & Miller since he left the Kansas Geological Survey in 1966. The court notes that Mr. Seevers testimony was both credible and coherent.

pond in the 1961 photograph extended from Division Street, past the short Alder Street extension, to the Balsam Street extension. At this time the pond was fairly large, covering nearly the entire northwest corner of the property. The 1961 photograph also indicates the presence of a free flowing well just south of, and at a higher elevation than, the pond. Thus, well water, which has been measured to be running at about 428.5 acre feet per year,[6] or an average of 382,539 gallons per day, a significant quantity, flows directly downhill into the pond. Additionally, this photograph shows a wet area in the northeast corner of the property which Mr. Seevers contended was the precursor to the third pond now occupying that area.

Mr. Seevers also testified from a 1973 photograph that the large pond found in the 1961 photograph was split in two by the further extension of Alder Street into the MRK property. From a 1976 photograph Mr. Seevers noted that the third pond in the northeast corner was beginning to take shape. He also noted that the well was still flowing. Similarly, Mr. Seevers testified that a 1982 photograph indicated wetness such as a pond in the northeast corner of the property.

The plaintiffs have developed a novel and complex theory of how the United States has caused the increased, and apparently increasing water on their property. This theory, which was developed by Dr. Maddox, plaintiffs' main expert, holds that the United States, by keeping Potholes Reservoir at the higher levels for longer periods of time has contributed to increasing water on the MRK property.[7] According to Dr.

Maddox' theory, the increased water comes from two separate sources. The fullness of the aquifer causes water to back up onto the property and also causes irrigation return flow to remain on the property rather than run off as it would do in the absence of a full aquifer.

In addition to regional geologic evidence, Dr. Maddox has approached verification of his theory in two ways. In the first he developed a water budget which compares the amount of water entering the property with the amount of water leaving the property. According to Dr. Maddox' measurements, more water left the property than entered from known measurable sources. This indicates, says Dr. Maddox, a contribution of water from the gravel aquifer. In the other way, he tested the water level via stakes placed in the area immediately adjacent to the shoreline of the easternmost pond. These stakes were to measure the changes in elevation of the pond, which, if Dr. Maddox' theory was correct, would presumably move in concert with changes in the elevation of Potholes Reservoir, though with some delay.

### DISCUSSION

The defendant presents two preliminary questions intended to preclude the court from reaching the merits of this case. First, defendant argues that the statute of limitations, 28 U.S.C. § 2501 (1982), operates to bar the plaintiffs' claim. Secondly, defendant relies upon the doctrine of laches to bar the claim. The court, for the reasons given below, finds that neither the statute of limitations nor the doctrine of laches would bar the plaintiffs' claim.

---

6. "325,850 gallons, or the amount of water which will cover one acre one foot in depth." *Black's Law Dictionary* 42, (4th ed. 1968.)

7. Dr. Maddox is President of George Maddox & Asso., Inc., a geology/hydrology firm. He has a Ph.D in geological engineering and an M.S. in groundwater geology. Dr. Maddox has had 28 years experience in his profession as a hydrologist and has written numerous papers on the subject. The court finds his testimony to be credible and well thought out. The court's problems are not with Dr. Maddox' veracity but with the correctness of his theory. It is a tribute to Dr. Maddox that plaintiffs' case is as

strong as it is. It is precisely because Dr. Maddox' theory was so well-developed that the court was required to make such an exhaustive analysis. In the end, however, the conclusion was fairly clear that the plaintiffs could not prevail. The reason this is so is that even with all of Dr. Maddox' ingenious theory, there is not really any substantial evidence that the water on MRK's property is a result of Potholes Reservoir's level. If, with such substantial theoretical backing, experimentation, and expert testimony, the plaintiffs cannot prove their case, the inference can only be that the underlying facts do not support it.

### THE STATUTE OF LIMITATIONS

A claim brought in this court must have accrued within six years prior to the filing of the complaint. 28 U.S.C. § 2501 (1982); *Bellamy v. United States*, 7 Cl. Ct. 720 (1985). The question of when a claim has accrued is particularly fact intensive and susceptible to varying interpretations. *Cooper v. United States*, 827 F.2d 762 (Fed.Cir.1987), *Barnes v. United States*, 210 Ct. Cl. 467, 538 F.2d 865 (1976). "A claim first accrues when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Ass'n v. United States*, 178 Ct. Cl. 630, 632, 373 F.2d 356, 358 *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967).

The case at bar presents a question of when a claim first accrues. It is undisputed here that plaintiffs were aware of the general wetness of the property as early as 1961. It is also undisputed that the amount of water on the property increased at least until 1976. There is also evidence that a new pond has formed and has continued to increase in size since 1977.

Relying on the evidence of increasing wetness, plaintiffs argue that this case falls within the "continuing process" exception to the running of the statute of limitations recognized by the Supreme Court in *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1946). In *Dickinson* the Court held that a plaintiff whose land was flooded over time by the United States was not required to bring suit until the situation became stabilized.

Although this case may arguably be like *Dickinson*, the court does not decide the question on the basis of *Dickinson*. Rather, the court is of the opinion that plaintiffs' claim here did not accrue until Dr. Maddox formulated his theory that the United States, by way of increased water levels in Potholes Reservoir, flooded the MRK property. The court recognizes that under normal circumstances the development of a theory of liability is not a part of the accrual of a claim. However, where damage is clear but the cause of damage is unknown, as is the case here, the plaintiffs have not sat upon their rights. Plaintiffs merely did not know who, if anybody, to sue. Were this a less complicated theory of liability, the court might not reach this conclusion. But, because of the uncertain cause of the increasing wetness and its slow pace, the court believes that the claim did not accrue until the early 1980's when Dr. Maddox first worked for the plaintiffs. This case was then filed well within the six-year period.

The defendant has argued that this case is like *Baskett v. United States*, 8 Cl.Ct. 201 (1985) *aff'd*, 790 F.2d 93 (Fed.Cir.1986), *cert. denied*, 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986). In *Baskett* the court held that the proper test for determining when the statute of limitations begins to run in the flood cases is when the damage has: "(1) manifested itself so that it should have been recognized, (2) the circumstances were such that the damage was a foreseeable future event, or (3) that the alleged effects of the dams' actions were fully known by the landowners." *Id.* at 231. The fault with reliance upon this test in this case lies in the fact that MRK well knew that its property was damaged, but did not know who did it, if anybody, or how. Thus, if the causal connection between Potholes Reservoir and the plaintiffs' land was clear, the test enunciated in *Baskett* would be applicable. Since the causal connection was not even theoretically clear, *Baskett* does not apply.

This result is not unlike that achieved in those cases where the injury was "inherently unknowable." *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed.2d 1282 (1949). In the *Urie* case the plaintiff had filed suit in 1941 seeking recovery for silicosis caused by the silica dust in which he had been working. The applicable statute of limitations was three years. Plaintiff had been working in the silica dust since 1910 but was not diagnosed to have silicosis until 1940. The defendant argued that the plaintiff "must unwittingly have contracted the silicosis long before 1938." *Id.* at 169, 69 S.Ct. at 1024. The Court held that the cause of action accrued in 1940,

the date of the doctor's diagnoses, rather than on the unknowable date on which he first contracted silicosis but did not know it.

Here plaintiffs knew that something was wrong, but did not discover what the possible cause was until 1981 when Dr. Maddox first began developing his theory. Causation of the flooding here was just as unknowable to MRK as the date of contracting silicosis was to the plaintiff in *Urie*. Neither cause of action accrued until the doctors' respective diagnoses.

## THE DOCTRINE OF LACHES

█ The defense of laches must also fail. For that doctrine to preclude an examination of the merits of this case the United States must show that "the [plaintiffs] lacked diligence in asserting [their] claim and ... that the defendant was prejudiced by this delay." *Bevelheimer v. United States*, 4 Cl.Ct. 558, 563 (1984). A showing of prejudice of course has many nuances but is usually referred to in terms of lost evidence or a change in position that would not have occurred in the absence of the delay. *Id.* Here it is clear that no unreasonable delay existed. The potential liability of the United States was not discovered by Dr. Maddox until sometime in 1981, and the suit was filed in 1983. Two years delay is not a long time given the complexity of Dr. Maddox' theory. Furthermore, there is nothing in the record indicating that evidence was lost in the years between 1981 and 1983. In fact, during this period plaintiffs attempted to develop and uncover evidence by various tests. The United States has also not changed its position during that period as a result of plaintiffs' failure to immediately file suit. Defendant's laches argument is wrongfully premised upon the belief that plaintiffs knew that the United States was the cause of the flooding.

## THE MERITS

█ The issue upon which this case turns is whether the plaintiffs have met their burden of proving that the United States is the cause of the MRK water troubles. The just compensation clause of the Fifth Amendment, under which plaintiffs proceed, provides in relevant part: "Nor shall private property be taken for public use, without just compensation." The question of whether private property has been taken has, over time, resulted in numerous fact intensive cases creating a body of law often confusing in its applications. This case, however, requires an application of more basic principles of causation. It is axiomatic that the United States is not liable unless it is the direct and proximate cause of the problem from which plaintiffs' complaint arises. *Baskett v. United States*, 8 Cl.Ct. at 210 (1985). In *Tri-state Materials Corp. v. United States*, 213 Ct.Cl. 1, 550 F.2d 1 (1977), the Court of Claims held, in a case somewhat akin to this one, that "[i]f we look to the consequences of the case at bar, we see a but/for relationship to the permanent flooding. This is all that is required." *Id.* at 8, 550 F.2d at 5.

The major hurdle facing plaintiffs on the track to recovery then is whether but/for the creation of Potholes Reservoir would the MRK lands be inundated with water. The plaintiffs have not convinced the court by a preponderance of the evidence that this is so. The plaintiffs' theory is well-structured, but the evidence does not prove that but/for the opening of Potholes Reservoir plaintiffs' land would be, if not high, at least dry.

## THE MADDOX' THEORY

Plaintiffs, in essence, contend that the maintenance of Potholes at the higher levels for longer periods of time has caused ground water, ultimately headed for the outlet that Drumheller Channel used to provide, to remain on low lying MRK lands rather than drain down towards what is now Potholes Reservoir. In short, the water in Potholes Reservoir acts like a plug in a drain. The plaintiffs put it this way:

As the stage of water in Potholes Reservoir rises and falls, the groundwater level in the "gravel aquifer" located to the north, northwest and northeast of Potholes rises and falls in general re-

sponse. Through time, the groundwater level in the gravel aquifer adjacent to MRK has reached a maximum stage which stage is directly related to the stages at which Potholes has been maintained. At very few locations, particularly the MRK property, the maximum stage of groundwater in the aquifer is fixed by the elevation of land surface. Here, where there is continuous inflow of groundwater from the·upgradient areas (from the north and northwest) on its way to Potholes, the stage of groundwater in the gravel aquifer reaches land surface and discharges as surface water.

As the stage of Potholes is lowered by the Project, a corresponding but delayed decline in stage of groundwater in the gravel aquifer results. The decline in the groundwater level in the aquifer causes the surface water discharge to cease until such time as the level of Potholes is again increased. At such times there is a limited reentry of the surface water back into the gravel aquifer from the MRK ponds.[8]

To prove this theory, MRK must, at the very least, establish a relationship between the water in Potholes Reservoir and the water on MRK land. MRK does not, and cannot, contend that the water from Potholes moves upgrade onto MRK property.[9] Rather, MRK contends that the Mae Valley Aquifer which is hydraulically contiguous with Potholes Reservoir, underlies the MRK land, and is therefore also hydraulically contiguous with its flooded areas.

There is agreement by both parties that an aquifer contiguous with Potholes Reservoir does exist. Whether that aquifer extends to or affects plaintiffs' land is disputed. The plaintiffs rely almost completely upon expert testimony to support their claim that the aquifer does extend to the MRK property. In addition to testimony concerning the geology of the Moses Lake area, the plaintiffs also rely upon the previously mentioned two approaches performed by their expert witness, Dr. Maddox. In the first approach Dr. Maddox calculated a water budget purporting to show that water from the aquifer was entering plaintiffs' property. In his second approach, Dr. Maddox attempted to show a relationship between Potholes and the MRK ponds through the placing of several stakes near the northeastern pond and measuring the varying depths of the pond over time. Neither the testimony on the geology of the area, nor the water budget, nor the stake test, adequately show the court that a relationship exists between Potholes Reservoir and the MRK land.

## THE GEOLOGY TESTIMONY

Dr. Maddox testified from a 1960 geological map of the area that in his opinion the gravel aquifer did extend to the MRK land. That map indicated essentially two types of ground in the area in question. The most prevalent, and labeled Qg on the map, was the aquifer gravel. The second type of ground, labeled Qrs and Qrl on the map, was a sandy material making up what is known as the Ringold Formation.

The Ringold Formation is not a part of the aquifer in question. Dr. Maddox testified that the Qg gravel was deposited in the area as a result of a glacially caused change in the path of the Columbia River.[10]

Dr. Maddox also testified from plaintiffs' Exhibit No. 7, a cross-section of the area north of the MRK property, that the western portion of the MRK land was underlain by the aquifer, marked as Qg. The eastern portion, according to Dr. Maddox, was un-

8. Plaintiffs' Post-trial Memorandum of Law at 3–4.

9. Potholes Reservoir is, as noted previously, maintained, for the substantial majority of the time, at levels below 1,046 feet; the lowest area of the MRK property. As the plaintiffs put it, "water does not run uphill and the ponded water at MRK is slightly higher in elevation than the surface water at Potholes Reservoir." Plaintiffs' Post-trial Memorandum of Law at 12.

10. "Between fifteen and twenty thousand years ago the path of the Columbia River was blocked by a lobe of the Cordilleran Ice Sheet. The Columbia River was [then] forced to flow southward through what is now known as the Quincy Basin of eastern Washington." Plaintiffs' Post-trial Memorandum of Law at 2.

derlain by the Ringold Formation, marked as Qrs and Qrl. However, to reach this conclusion Dr. Maddox had to extrapolate from the cross-section to where the MRK property would lie. This is not convincing to the court. The cross-section covers a fairly large area and could not have been detailed to such a degree as would be required to accurately predict that part of the MRK property was above an aquifer and part was not.

Similarly, the defendant argues that the geologic map covers too large an area for an accurate determination of whether a certain type of geology extends to a small area of property. The court finds this to be a credible observation. Dr. Maddox' conclusion rests upon the accuracy of the map in question. This map was intended to provide a general geologic overview of a large area of Washington State and thus was not intended to provide an accurate picture of specific geological boundaries. Liability of the United States cannot be predicated upon speculation, expert or not.

Additionally, Dr. Maddox testified that: "In general, the gravels on the MRK property are the same as those gravels in the Mae Valley area, except that the matrix—that is, the interstitial areas between gravel particles—are filled with a very fine grain of material, probably part of the silt fasces of the Ringold to the gravel on MRK property." [11] Dr. Maddox went on to testify that because of the interstitial material, the gravels on the MRK property have a lower transmissivity than the Mae Valley gravels. This means that the MRK gravels provide a greater resistance to the flow of water than do the Mae Valley gravels without the interstitial material.

However, contrary to Dr. Maddox' testimony on this point, Mr. Seevers testified that no Bureau of Reclamation drilling had discovered aquifer gravel on the MRK property. Rather they "found Ringold in all of the wells that we drilled on the property." [12] Comparisons between the Mae Valley gravels and rocks found on the MRK property, substantiated Mr. Seevers testimony. Mr. Seevers took Mae Valley gravel from an abandoned gravel pit near Potholes Reservoir. This gravel had an effective grain size of .83 millimeters and a permeability value of 4,500 gallons per day per square foot. The MRK gravel taken from Well No. 7 located on the property had an effective grain size of .074 millimeters and a permeability value of less than 100 gallons per day per square foot.[13] This is a very significant difference. Mr. Seevers conceded that there was no test made on that part of the property which was under water. The court is in agreement with Mr. Seevers that "all in all, there's a big question mark as to what is truly under this part of the property." [14]

Defendant has also presented evidence contrary to plaintiffs' assertion that the aquifer extended to the MRK property. Defendant's Exhibit No. 12, a smaller scale and presumably more accurate map, showed that the MRK property was mostly bounded and underlain by the geology of the Ringold Formation rather than the Mae Valley Aquifer represented by the Qg symbol. The map does show, although not conclusively, that a small portion of the northwest corner of the MRK property may be underlain by the Mae Valley Aquifer. This is not enough evidence, however, to hang the proverbial hat upon. Mr. Seevers also testified that the Mae Valley Aquifer gravels "pinch out" near the MRK property [15] and that there is a clay barrier separating Potholes and the MRK property.[16]

In sum, the testimony concerning the geology of the MRK property, and the areas surrounding that property, is conflict-

11. Tr. at 102.

12. *Id.* at 967.

13. *Id.* at 998.

14. *Id.* at 968 (Mr. Seevers).

15. *Id.* at 971.

16. *Id.* at 1008. (Although the court does not subscribe completely to Mr. Seevers' conclusions that the gravels "pinch out" or that there is a clay barrier, the conflicting testimony on this issue underscores the difficulty with plaintiffs' case.)

ing and reflects a basic uncertainty about what exactly underlies and affects the property. Although the defendant's testimony is more convincing than the plaintiffs', the court is not in a position to conclude directly what type of geology underlies the property. Therefore, it is sufficient to say that plaintiffs have not, through the geology testimony, met their burden of proof on this factual issue. There is little to convince the court that the Mae Valley Aquifer extends to, or affects, the MRK land.

## THE STAKE TEST

In order to confirm Dr. Maddox' theory, plaintiffs placed in evidence data from a stake test. To conduct this test Dr. Maddox placed three stakes into the area directly adjacent to the shoreline of the northeast pond and near well eleven. The theory of the stake test was that the rising water level could be measured periodically by noting the distance from the top of the stakes to the water.

The change in water level as reflected by the stakes was admitted into evidence in hydrograph form.[17] These hydrographs show that the water level of the northeast pond increased over the months from November, 1984, to February, 1985, with February 21, 1985, being the highest reading on all three stakes. Potholes Reservoir, on the other hand, reaches it highest point in mid to late March of each year, and the peak in 1985 was March 30–31.[18] Dr. Maddox testified that in his opinion "the rise and fall of that stage of water of those three stakes is related to the contribution of water to the MRK property from the ground aquifer."[19]

The value of the stake test as conclusive evidence of a relationship between Potholes Reservoir and the MRK property is minimal. There are many factors which might affect a stake reading, including the spongy soil in which they were placed, precip-

itation, and water trapped by ice.[20] In addition, there is little actual correlation between the level of Potholes Reservoir and the level of the MRK pond. In the absence of a "dampening effect [of] about nine to ten and one-half months,"[21] which is improbable, there could be no relationship between the two. If there were a relationship between the two, the water level in the MRK ponds would have risen continually, at least until sometime *after* late March of 1985, the point at which Potholes Reservoir was at its highest. Although the court does not totally discount the stake test, it does not adequately support plaintiffs' theory of a relationship between the MRK ponds and Potholes Reservoir.

## THE WATER BUDGET

The plaintiffs also rely upon a water budget prepared by Dr. Maddox. The water budget in essence compares the amount of water entering the property from known sources with the amount of water exiting the property. Dr. Maddox determined that 509.95 acre feet of water from various *known* sources entered the property per year. He also determined that 712.4 acre feet of water per year from *all* sources left the property. The difference between the two, 202.45 acre feet per year was, in Dr. Maddox' opinion, "representative of the net inflow to the property from the gravel aquifer that's hydrologically contiguous with Potholes Reservoir."[22]

The water budget approach requires a precise identification of each source of water inflow and outflow. Although Dr. Maddox' measurements seem to be reasonably well calculated, they do not rise to the level of accuracy required to convince the court that the additional water is caused by the aquifer. Nor do they operate to exclude all other possible non-aquifer sources of water input and output. Dr. Maddox admitted on direct examination that the measurements were not the most accurate since water

17. Plaintiffs' Ex. Nos. 17a–c.

18. Tr. at 303.

19. *Id.* at 307.

20. *Id.* at 1234–36 (testimony of Mr. Seevers).

21. *Id.* at 1237–38 (the Court).

22. *Id.* at 262; Plaintiffs' Ex. No. 21.

change could be "expressed in the property just getting wetter or, conversely, the property, ... getting dryer."[23] There is also some indication that trash near the pond discharge culverts was interfering with Dr. Maddox' measurements.[24] Additionally, Mr. Seevers testified that it is:

> Very dangerous to take a small watershed and assume that you know exactly what's going on rainfall-wise on that particular piece of land, and its very easy to get in trouble if you just simply make the assumption that since it rains so many inches at Moses Lake Airport ... that it would necessarily have fallen in this small watershed.[25]

This testimony is representative of the trouble which the court has with the water budget as a means of proving hydraulic continuity between the MRK ponds and Potholes Reservoir. The court is not convinced that the aquifer is the only explanation for the difference in the amount of water entering the land and the amount leaving the land even assuming that Dr. Maddox' measurements are reflective of the underlying reality.

While it is true that there are inconsistencies in Mr. Seevers' testimony, it is also true that the testimony points out the inherent weaknesses found in the water budget approach. For instance, Mr. Seevers testified that water was leaking through the basalt onto MRK property. This particular source of water, if it exists, is probably small, but nevertheless, it underscores the point that there may be alternative sources of water not considered by Dr. Maddox.

The court while not specifically finding that the water budget is useless notes that liability of the United States cannot be founded upon unproven, but aesthetically pleasing theories of liability. The testimony of defendant on this issue convinces the court that there may very well be a non-aquifer explanation for the water on the MRK land.

This is consistently true over the entire scope of this case. This case is founded upon a theory, an interesting and intellectually stimulating theory, but a theory nonetheless. None of the testimony indicates to the court upon a preponderance of the evidence that the United States is the direct and proximate cause of the increasing water on the MRK property. In fact there is evidence that the water level in the aquifer reached its peak in the late 1960's.[26] Also, there is testimony that the amount of irrigation return flow to the MRK land reached a peak in the 1960's.[27] Additionally, the levels of the observation wells had stabilized in the late 1960's.[28]

Evidence such as this causes the court to further doubt the practical validity of Dr. Maddox' theory. The stabilized groundwater levels of the late 1960's are inconsistent with evidence clearly suggesting rising water levels on the MRK property into the 1980's. Even assuming that the gravel aquifer was contiguous with the MRK property, it is difficult to envision the cause of increased water flow onto the property given that the aquifer has been stabilized for about 20 years.

For the above reasons, the court is compelled to conclude that plaintiffs' claim has not been proven. Therefore, the clerk is directed to enter judgment dismissing the complaint.

---

23. *Id.* at 265 (the Court).

24. *Id.* at 244.

25. *Id.* at 1231–32.

26. *Id.* at 1662 (testimony of Dr. Maddox).

27. *Id.* at 1665.

28. *Id.* at 1643–44.